514 So.2d 99 (1987)
STATE of Louisiana
v.
John A. BROWN, Jr.
No. 86-KA-1941.
Supreme Court of Louisiana.
October 19, 1987.
Rehearing Denied November 19, 1987.
*101 William J. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Eric Dubelier, Michael McMahon, Asst. Dist. Attys., for appellee.
Dwight Doskey, Orleans Indigent Defender Program, M. Craig Colwart, New Orleans, for appellant.
CALOGERO, Justice.
In this appeal from defendant's conviction of first degree murder and sentence of death, the principal issues involve (1) the state's use of court records to establish defendant's prior convictions during the penalty phase of the proceeding (assignment of error number four); and (2) the assertion of the privilege against self-incrimination by a witness called on behalf of the defendant during the penalty phase, and the trial judge's ruling that she was not required to assert the privilege question by question (assignment of error number six). After considering these and other issues raised by defendant's assignments *102 of error,[1] and upon an independent review of the record, we affirm the conviction and uphold the death sentence.
John A. Brown, Jr. was indicted by the Orleans Parish grand jury for the first degree murder of Omer Laughlin. Mr. Laughlin was robbed and stabbed to death on a New Orleans street corner on September 7, 1984. The jury convicted Brown of first degree murder following the guilt phase of a bifurcated trial. After a sentencing hearing held pursuant to La.Code Crim.Proc.Ann. art. 905.1 et seq. (West 1984 & Supp.1987), the jury unanimously recommended the imposition of the death penalty upon finding two statutory aggravating circumstances: (1) the murder was committed during the perpetration of an armed robbery and (2) the offense was committed in an especially heinous and cruel manner. La.Code Crim.Proc.Ann. art. 905.4(a) & (g) (West 1984).

FACTS
The state established the following facts through the evidence it presented at the trial. On the night of the murder, Mr. Laughlin and his wife had eaten dinner at a restaurant near the corner of Dauphine and Touro Streets in New Orleans. At approximately 11:45 p.m., they left the restaurant and began walking to their car, which was located about a block away. The defendant exited a nearby vehicle and confronted the Laughlins. He pinned them against their car, and demanded money from Mr. Laughlin. Mrs. Laughlin screamed and ran back toward the restaurant. When she returned to the scene a short time later, her husband was dead. According to a New Orleans police officer who had arrived at the location, the victim was found lying "face down in the street, bleeding profusely." An autopsy later revealed that Mr. Laughlin had been stabbed thirteen times.
Mrs. Laughlin provided the police with a description of the perpetrator and the vehicle which she had seen him get out of prior to the attack. She also told police that a woman with dark hair had been driving that car.
Sgt. James Scott of the New Orleans Police Department was stopped at a traffic light on Franklin Avenue when he heard the description of the crime and the suspect being broadcast over the police radio. He looked to his left and saw defendant sitting in a vehicle that matched the description given by the victim's wife. There was a female at the wheel of the car. Defendant's vehicle pulled into a nearby service station, and Sgt. Scott followed, believing that the occupants of the car might be the suspects being sought. The officer watched as the woman put gasoline in the car while defendant walked over to a water hose and began washing his hands. Defendant then re-entered the car.
Sgt. Scott approached the vehicle and ordered the defendant to step out and place his hands on the hood of the car. When Brown did so, the police officer observed scratches, marks and droplets of blood on Brown's forearms. He also observed blood between defendant's toes, which were visible through the sandals that he was wearing. In plain view on the floor of the car was a New Orleans shopper's card which belonged to the victim.
Defendant was arrested and taken into custody. A search of the vehicle pursuant to routine police procedure yielded Mr. Laughlin's wallet. A second search pursuant to a properly secured warrant led to the discovery of a Bowie knife which had been concealed underneath the front seat of the car on the passenger side. Mrs. Laughlin positively identified Brown from lineup photographs as the man who had attacked her husband.
Anna Hardeman, the driver of the vehicle in which Brown was riding at the time of his arrest, was also indicted for first degree murder. Although she was originally charged in the same bill of indictment *103 that named Brown as a defendant, the prosecution severed the charges against her on the date that the case was called to trial, and announced that she would be tried separately. Shortly after Brown was convicted and sentenced to death, Hardeman pled guilty to the amended charge of accessory after the fact to first degree murder, and was sentenced to five years imprisonment at hard labor.
On appeal, the defendant directs two assignments of error to the selection of the jury, one to the guilt phase of the trial, and five to the sentencing hearing. Each of these assignments is reviewed below.

JURY SELECTION

Assignments of Error Nos. One and Two
By these two assignments of error, defendant contends that the trial judge erred in excusing for cause prospective jurors Lynda Boren and Julien Cardiff, Jr., on the basis of their stated opposition to the death penalty. Defendant argues that these prospective jurors should not have been excused because they indicated during voir dire that they could vote to impose the death penalty under certain circumstances, even though they were generally opposed to capital punishment.
After reviewing the voir dire testimony of the prospective jurors in question, we cannot agree with the defendant's summary of the position of these two jurors on capital punishment. Both unambiguously stated, in spite of efforts by defense counsel to elicit testimony to the contrary, that they would not vote to impose the death penalty.
Ms. Boren advised the prosecutor that she could not consider voting for the death penalty under any circumstances, for personal reasons. She then stated in response to one of defense counsel's questions that she could vote for the death penalty "[o]nly in a case of a heinous crime. Charles Manson or somebody like that." However, she responded to further questioning by defense counsel, that "I would not vote for the death penalty," and the total impression left by her voir dire testimony was that her strong opposition to capital punishment would lead her to vote against the imposition of the death penalty regardless of the evidence.
Similarly, Mr. Cardiff frankly stated that while he would attempt to weigh the evidence objectively as to the guilt or innocence of the accused, his opposition to capital punishment on moral grounds would "foreclose" any possibility that he would vote to impose the death penalty. Although this prospective juror also stated in response to one question that he would "consider the two alternatives" if faced with the choice of sentencing a person to life imprisonment or death, he added that his mind would be "definitely skewed one way," meaning against capital punishment. Again, the overall impression left by the prospective juror's voir dire testimony is that he would not have voted to impose the death penalty under any circumstances.
La.Code Crim.Proc.Ann. art. 798(2) (West 1981) provides in pertinent part that the state has good cause to challenge a juror when that juror:
has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him....
Article 798 tracks language in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in which the United States Supreme Court indicated that it was proper for the state to exclude a juror for cause if he makes clear that he would automatically vote against the death penalty. Witherspoon's holding was subsequently clarified in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which held that a prospective juror may be excused for cause when it is clear that his opposition to the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Considerable discretion should be afforded *104 the trial judge in the determination of whether a prospective juror's views on capital punishment warrant a challenge for cause. Wainwright, 469 U.S. at 426-29, 105 S.Ct. at 853-55, 83 L.Ed.2d at 853-55; State v. Ward, 483 So.2d 578, 583 (La.), cert. denied, ___ U.S. ___, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986); State v. Jones, 474 So.2d 919, 928 (La.1985).
Review of the complete testimony of both prospective jurors makes it clear that they would vote against the imposition of the death penalty under any circumstances. Thus they fall into the category of jurors who may be challenged for cause under article 798 and within the federal constitutional limits provided by Wainwright and Witherspoon. We therefore cannot say that the trial judge abused his discretion by excluding these prospective jurors for cause.

GUILT PHASE

Assignment of Error No. Three
Only one of the eight assignments of error pertains strictly to the guilt phase of the proceeding. It was not disputed at trial that the defendant was the person who stabbed and killed Mr. Laughlin. Counsel for the defendant acknowledged as much during voir dire and in his opening statement. Nor was there any true dispute about the fact that the murder occurred during the perpetration of an armed robbery. However, defense counsel did argue that at the time of the murder, Brown lacked specific intent to kill or inflict great bodily harm.
In assignment of error number three, the defendant argues that the state failed to present sufficient evidence to prove its case as to every element of the crime charged. Because defense counsel failed to brief this assignment or raise the same in oral argument, it is not apparent which element or elements of the offense the defendant contends were not sufficiently proven. Nonetheless, our independent review of the record convinces us that the evidence of guilt was overwhelming, and that the state proved beyond a reasonable doubt each and every element of the offense charged.
As noted above, the defense admitted that Brown was the person who stabbed Laughlin to death. Even without that admission, the evidence establishing him as the perpetrator left no room for doubt: the discovery shortly after the crime of personal effects of the victim in his car; the discovery of the knife under the seat of his car; the identification by the victim's wife; the scratch marks and blood on his person at the time of his arrest. The fact that Brown had also robbed Laughlin while armed with a deadly weapon is made obvious through the same evidence, as well as separate testimony regarding the multiple stab wounds inflicted upon the victim. The issue which the defendant presumably desires to raise through this assignment is whether there was sufficient evidence for the jury to find that Brown had specific intent to kill or inflict great bodily harm.
The evidence clearly supports the jury's conclusion that the defendant acted with the requisite intent. The victim's wife testified that the defendant pinned her and her husband against a car and demanded money. The pathologist who performed the autopsy on Mr. Laughlin testified that the victim received thirteen stab wounds, at least two of which were over five inches deep. The number and severity of the stab wounds compel the conclusion that the victim was not killed accidentally or incident to a struggle. The testimony and physical evidence sufficiently established that the defendant had specific intent both to commit armed robbery and to kill or inflict great bodily harm. The defendant presented no evidence to the contrary.
The evidence fully supports a finding that the defendant committed first degree murder. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cruz, 455 So.2d 1351 (La.1984). This assignment of error is without merit.

PENALTY PHASE
The remaining assignments of error pertain to the penalty phase of the proceeding. They are addressed here in the order raised by defendant.

*105 ASSIGNMENT OF ERROR NUMBER FOUR
The defendant contends in this assignment that the trial court erred in admitting into evidence state's exhibits S-26 through S-31 during the penalty phase of the proceeding. The referenced exhibits were certified copies of court records which were introduced to establish that the defendant had been convicted of previous crimes. Specifically, the state sought to demonstrate through these exhibits that the defendant had the following prior convictions:
(1) simple burglary, Orleans Parish, 1979 (S-26);
(2) simple robbery, St. Bernard Parish, 1979 (S-27);
(3) theft, Jefferson Parish, 1980 (S-28);
(4) simple burglary, St. Bernard Parish, 1983 (S-29);
(5) simple escape, St Bernard Parish, 1982 (S-30);
(6) attempted first degree murder, Orleans Parish, 1985 (S-31) and
(7) four counts of armed robbery, Orleans Parish, 1985 (S-31).
Although the defendant did not brief this assignment of error or raise the same in oral argument we consider it nonetheless. We believe that it presents a twofold question: (1) whether evidence of the prior convictions was admissible during the penalty phase, and (2) whether the state sufficiently proved that defendant had been convicted of each of the offenses referred to in the exhibits. Defense counsel raised both issues in his timely objections to the introduction of these exhibits during the penalty phase.
On the first question, this Court has held on more than one occasion that evidence of a defendant's prior convictions is admissible during the penalty phase of a first degree murder trial on the issue of the defendant's character. State v. Ward, 483 So.2d 578 (La.), cert. denied, ___ U.S. ___, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986); State v. Jordan, 440 So.2d 716 (La.1983). La. Code Crim.Proc.Ann. art. 905.2 (West 1984) states that the sentencing hearing "shall focus on the circumstances of the offense and the character and propensities of the offender." We have interpreted this provision to allow the state to introduce evidence pertaining to the defendant's character, including evidence of prior convictions, even if the defendant does not first place his character at issue. State v. Jordan, 440 So.2d at 718-20. As explained in Ward:
This court has accepted evidence of other offenses as relevant, competent evidence of the defendant's character in the penalty phase of trial. In State v. Jordan, 440 So.2d 716 (La.1983), it was held correct for the judge to allow the prosecution to anticipatorily introduce evidence of the defendant's prior convictions. This was because C.Cr.P. 905.2 provides that the sentencing phase "... shall focus on the circumstances of the offense and the character and propensities of the offender...." (Emphasis added). That statute further provides that evidence relative to aggravating or mitigating circumstances is relevant, even if the defendant does not place his character in issue.
483 So.2d at 588-89.
Therefore, we conclude that it was permissible for the state to offer evidence of the defendant's prior convictions during the penalty phase. The remaining question with respect to this assignment is whether the state proved through competent evidence that it was defendant who was convicted of the crimes described in the written exhibits.
Specifically, defense counsel indicated in his objection to the introduction of the exhibits that there was no proof that the defendant was the same John A. Brown, Jr., who was described in the records of the prior convictions. The trial judge overruled the objection, after receiving assurances from the prosecutor, out of the presence of the jury, that he had obtained a copy of Brown's "rap sheet" and confirmed that the defendant was the same person described in exhibits S-26-31. The exhibits were then allowed into evidence over the defendant's objection, and shown to the members of the jury.
*106 We have considered the issue of the level of proof necessary to establish prior convictions in cases arising under this state's multiple offender law, La.Rev.Stat. Ann. § 15:529.1 (West 1981 & Supp.1987). When a defendant is prosecuted under that statute, proof that the accused was convicted of a prior offense is necessary to establish an essential element of the crime charged. In that context, we have held that the fact that the defendant and the person described in the records evidencing the prior convictions have the same name is, standing alone, insufficient to prove that the defendant was the same person who was convicted of the previous crimes. City of Monroe v. French, 345 So.2d 23 (La. 1977); State v. Curtis, 319 So.2d 434 (La. 1975). While it is permissible for the state to introduce certified copies of court records evidencing prior convictions, we have determined that § 15:529.1 requires independent proof that the defendant was the same person identified in the records. The state may establish proof of identity in various ways, such as the testimony of witnesses to the prior crimes, expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding, or photographs contained in a duly authenticated record. State v. Curtis, 338 So.2d 662, 664 (La.1976).
In this case, there was corroborating evidence during the penalty phase that the defendant committed four of the seven convictions chronicled in S-26 through S-31. Joseph Simon, called as a witness by the state during the penalty phase, testified on the facts surrounding defendant's 1985 convictions for armed robbery and attempted first degree murder (S-31). Simon was a victim of those offenses and described to the jury how he was shot and robbed by Brown. He also testified that he was aware that Brown had been convicted of charges arising out of those events in Orleans Parish in 1985.
The defense called Brown's mother to the stand during the penalty phase, and on cross-examination she admitted that she was aware that Brown had been convicted of simple burglary in Orleans Parish (S-26). She also testified that she recalled going to the courthouse in St. Bernard Parish with her son, and when asked if she were aware that he had been convicted of burglary in that parish (S-29), she answered: "I think so, but like I said, my memory's no where now." Mrs. Brown further testified that she did not remember whether or not her son had been convicted of the remaining crimes evidenced by the written exhibits.
Thus the state provided sufficient evidence for the jury to conclude that the defendant was the same person who was convicted of the crimes evidenced by S-26, S-29 and S-31.[2] It presented no corroborating evidence with respect to S-27 (simple robbery, 1979), S-28 (theft, 1980) and S-30 (simple escape, 1982). The defendant has at no time contended that he was not the same John A. Brown, Jr. whose convictions are shown by these exhibits. Nevertheless, the question remains whether the state was required to provide independent evidence of Brown's identity with respect to these three remaining convictions.
If our cases interpreting the level of proof for prior offenses required under the multiple offender statute were made applicable to the level of proof needed in a penalty proceeding, we would have to conclude that it was error for the trial judge to allow these three exhibits into evidence without independent proof of identity.[3] Arguably, *107 however, the multiple offender situation, where the prior conviction is an element of the offense charged, and therefore must be proven beyond a reasonable doubt, requires more with respect to corroborative evidence than the penalty phase of a capital proceeding, when the prior convictions are used to place the character of the accused in issue.[4] The defendant, of course, has the right to rebut evidence which the state offers regarding his character by calling his own witnesses during the penalty phase.
However, we need not resolve today whether the same considerations of proof apply in the two contexts discussed, because we conclude that any error caused by allowing S-27, S-28 and S-30 into evidence in this case was harmless. As previously noted, the state proved through competent evidence that the defendant had four prior convictions during the period from 1979 to 1985. Amply substantiated by the evidence were the most serious of the previous crimes, the 1985 convictions for armed robbery and attempted first degree murder. Even if three of the seven prior convictions (for simple robbery, theft and simple escape) were improperly admitted, we cannot conclude that the jury's knowledge of those three convictions contributed to its decision to impose the death penalty. Also, we deem it worth repeating here that defendant has not contended that he is not the same John A. Brown, Jr., convicted of each of the seven crimes.
The prosecutor did make a number of references to the defendant's prior record during his arguments to the jury at the close of the sentencing hearing. However, with four prior convictions proven by competent evidence, he would have been able to make essentially the same argument even if evidence of the simple robbery, theft and simple escape convictions had not been introduced. From our review of the record of the sentencing hearing, we are unable to detect any prejudice to defendant from the admission into evidence of these three convictions, and therefore conclude that any error with respect to their admission was harmless beyond a reasonable doubt. See State v. Green, 493 So.2d 1178, 1185 (La. 1978). This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. FIVE
Defendant also contends that it was error for the trial court to allow Joseph Simon to testify during the penalty stage of the trial. As previously discussed, Mr. Simon was the victim of an armed robbery and attempted murder perpetrated by the defendant in 1984, and he testified regarding those crimes. Although defense counsel timely objected to Mr. Simon's testimony at trial, no specific reason was offered in support of the objection and it was overruled by the trial court. On appeal, the assignment of error is not briefed. Our review of the record leads us to the conclusion that the trial judge did not err by allowing Mr. Simon to testify.
The substance of Mr. Simon's testimony was clearly relevant in that it provided direct evidence of prior crimes for which the accused had been convicted. That evidence was properly admissible on the issue of character, for the reasons set forth in our discussion of assignment of error number four. Thus, there was nothing improper about the substance of the testimony given by this witness.
*108 Nor is any argument made that the defendant was unduly or prejudicially surprised by the state's decision to call Mr. Simon as a witness in the penalty phase of the trial. Because the character of the accused was automatically at issue in the penalty phase and in light of the fact that the defendant had been convicted only months before this murder trial of the charges arising out of the attempted murder and robbery of Mr. Simon, it is not unreasonable to conclude that defense counsel was aware of the possibility, or likelihood, that Mr. Simon would be called as a witness during the penalty phase.[5] Therefore, we find no basis of support in the record for the proposition that the trial court erred by allowing the testimony of Mr. Simon, and conclude that this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. SIX
Anna Hardeman, the driver of the vehicle which the defendant Brown used to leave the scene of the murder, was called as a witness for the defendant during the penalty phase of the trial. At the time, she was also under indictment for the first degree murder of Brown's victim, Laughlin. She later pled guilty to the amended charge of accessory after the fact to murder.
After Hardeman answered several questions posed by defense counsel, the prosecution interjected and inquired as to whether, in light of the fact that the murder charge was pending against her, she should consult with a lawyer prior to anwering any further questions. The judge ruled that Hardeman would be allowed to consult with her attorney while other witnesses were testifying, and could possibly be recalled to the stand. When defense counsel later stated his desire to recall the witness to the stand, the trial judge stated that he had spoken with Hardeman's attorney in the interim and that the attorney had advised Hardeman not to testify on any matter related to the case based upon her Fifth Amendment privilege against self-incrimination. The judge then ruled that the witness would not be required to testify further because:
this Court feels that he has to honor that [Fifth Amendment] privilege and the Court cannot force her to testify against the advice of her attorney. The Court also feels that the case law is clear that I cannot force her to exert her Fifth Amendment privilege to the jury once we *109 have been put on notice that she does intend to use that privilege.
Defense counsel objected to the ruling and advised the court, out of the presence of the jury, of the subject matter of the testimony which the defense expected to elicit from the witness:
Ms. Ann Hardeman was called for the purpose of testifying that on September 7th of 1984, she saw John Brown. At the time she saw him, he was intoxicated. It was a short period before the time of this alleged incident. That she had discussions with him about the drugs he had used, that he told her that he had been shooting up on various types of drugs, that she was with him and that she did not see him with a knife on that occasion. We, had we asked those questions, do not feel that they were the proper questions to be subject to the Fifth Amendment plea.
In this assignment, the defendant contends that it was error for the trial judge not to allow Hardeman to testify. We find that actually three issues are presented in connection with the testimony of this witness: (1) whether she had the right to invoke the Fifth Amendment privilege in response to questions on the subjects raised or sought to be raised by defense counsel; (2) assuming she had the right to assert the privilege, whether the trial judge erred by refusing to allow further questioning, and providing her with a "blanket" privilege, rather than requiring her to assert the privilege in response to each successive question; and (3) whether the witness waived any privilege she might otherwise have been entitled to assert because of answers that she did initially give to questions posed by defense counsel.
With respect to the first issue, we have consistently held that a witness may invoke the Fifth Amendment privilege against self-incrimination[6] only in response to questions "where the defendant has reasonable cause to apprehend danger from a direct answer." State v. Edwards, 419 So.2d 881 (La.1982); State v. Coleman, 406 So.2d 563, 566 (La.1981) (citing Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951)).
In this case Hardeman was under indictment for the same murder for which Brown was charged. Defense counsel's area of proposed questioning pertained to whether she was with the defendant on the day of the murder, and if so, at what point in time; to conversations she allegedly had with him; and to whether she knew if he was intoxicated or had been using drugs. Clearly she had reasonable cause to apprehend danger from direct answers concerning her whereabouts and contacts with Brown on the day of the murder. We find her position to be very similar to the situation of witnesses who were allowed to invoke the privilege against self-incrimination in Edwards, where
both of the witnesses that the defendant sought to call were charged with first degree murder for the same crime as that charged to the defendant. Neither had yet been tried. Clearly there was reasonable danger that direct answers to questions concerning the events of the night of the murders could be injurious to them, entitling them to the Fifth Amendment's protection.
419 So.2d at 892.
Clearly, it was not error for the trial court to allow Hardeman to assert the Fifth Amendment privilege as to all questions regarding any contacts or conversations with Brown she had on the date of the murder.
The next issue is whether the trial court should have required her to assert the privilege to each of successive questions rather than allowing a blanket assertion based upon her lawyer's representation that she would respect his advice, assert *110 the privilege, and answer no further questions about the case.
We have held that the proper exercise of the privilege for a witness, as opposed to a defendant:
requires that the witness take the stand and answer the questions put to him, save for those instances where it is "evident from the implication of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, supra.

State v. Wilson, 394 So.2d 254, 258 (La. 1981).
In Wilson, we reversed the defendant's conviction for distribution of heroin on the ground that the trial court improperly refused to require a witness who was called by the defendant and who claimed a Fifth Amendment privilege to assert the privilege on a question by question basis. There was no indication in Wilson of why the witness had any basis to fear self-incrimination, and under those circumstances we held that he should be required to take the stand and assert the privilege only after and in response to successive particular questions.
However, we have subsequently held that it is not necessary for a witness charged with participating in the same crime for which the defendant is being tried to assert the privilege on a question by question basis when it is apparent that the witness will be asked to testify only regarding matters which could be expected to require the invocation of the privilege. In State v. Darby, 403 So.2d 44 (La.1981), cert. denied, 454 U.S. 1152, 102 S.Ct. 1022, 71 L.Ed.2d 308 (1982), the trial judge allowed the witness to invoke the privilege as to all questions concerning the evening of the murder for which the defendant was charged. He did not require the assertion of the privilege on a question by question basis. The witness had been separately charged for his alleged participation in the same murder. Upholding the trial court's decision to allow the invocation of the privilege in this fashion, we held that "[i]n this factual context, no purpose would have been served in requiring a question by question assertion of Gautreaux's privilege." 403 So.2d at 48-49.
In State v. Edwards, 419 So.2d 881 (La. 1981), we held that a question by question assertion of the privilege was not necessary in the case of two witnesses charged with first degree murder, the same crime for which the defendant was being tried. We found that questions to those witnesses regarding the night of the murders would place them "in a position where refusal to answer or an explanation of that refusal could result in injurious disclosures." 419 So.2d at 892. We therefore concluded that "[o]nce the trial judge determined that they would refuse to answer any questions concerning the murders, it was proper for him not to allow the witnesses to be called before the jury." Id.
Similarly, in State v. Coleman, 406 So.2d 563 (La.1981), we declined to require the question by question assertion of the privilege by two witnesses charged with crimes related to the offenses for which the defendant was being tried. In so doing, we cited the rule that question by question responses are not required "where it is evident from the nature of the question and the position of the witness that an answer or explanation of a refusal to answer any question posed could result in an injurious disclosure." Id. at 566. It also seemed obvious that any testimony by either witness would be self-incriminating.
Darby, Edwards and Coleman all held that question by question invocation of the privilege was not necessary under circumstances in which the witness invoking the privilege was charged with participating in the same crime as the defendant on trial and in which it was apparent that the questioning would be devoted to subject matter which would require the defendant to invoke the privilege. In each of the situations posed by those three cases, either an answer or an explanation of a refusal to answer could result in disclosures injurious to the witness. In other words, where a witness in this position has reasonable *111 grounds to assert the privilege as to the entire area of expected questioning, we have not required the witness to take the stand and risk making an injurious disclosure through any answer or explanation of a refusal to answer.
In this case, the defense made clear that it desired to question the witness in an area in which she was well within her rights to assert the privilegealleged contacts and conversations she had with the defendant on the day of the murder, and where the witness herself was charged with the same crime. On appeal, the defendant reurges "that the testimony sought from Ms. Hardeman concerned the defendant's use of drugs and his state of intoxication on the day of the killing...." We simply do not agree with the defendant's contention in brief that "answers given by the witness in connection with [this] specific subject area could not result in injurious disclosure to the witness in regard to the charge then pending against her."[7] The charge "then pending against her" was the first degree murder of the very same victim, Omer Laughlin. Any testimony regarding her contacts or conversation with Brown on the date of the murder could tend to be incriminating. She was entitled to invoke the privilege, and question by question assertion of the privilege was not required under the circumstances of this case.[8]
The final issue with respect to this assignment is whether the defendant waived her right to assert the privilege based on the answers she did give to defense counsel's questions before invoking the Fifth Amendment. When initially called to the stand, Ms. Hardeman stated her name and age and acknowledged that she had known John Brown for eight years. She further testified as follows:
Q. Now, were you with him on September the 7th, 1984?
A. Yes, I was.
Q. What time did you see him that day?
A. It was around four, four thirty.
Q. In the afternoon or the morning?
A. In the afternoon.
Q. Where did you see him?
A. By the river, on, I think, its South Peters in Arabi.
At that point in the questioning, the prosecutor interjected and asked the court whether Ms. Hardeman should have the opportunity to consult with a lawyer, given the fact that she was under indictment for first degree murder. After such consultation was had, the privilege was invoked and no more questions were allowed.
We have held that while a defendant waives his Fifth Amendment privilege when he takes the stand, a witness who is not accused may, under certain circumstances, take the stand and testify as to some matters while invoking the privilege as to others. State v. Benoit, 440 So.2d 129, 132-33 (La.1983); State v. Bolen, 338 So.2d 97, 99 (La.1976); State ex rel. Doran v. Doran, 215 La. 151, 39 So.2d 894 (1949). Thus the fact that the witness took the stand and answered some questions does not constitute an automatic waiver of the privilege.
The narrower issue is whether Hardeman's admission that she had seen Brown in Arabi on the afternoon prior to the night of the murder resulted in a waiver of her right to assert the privilege with *112 respect to questions about any further contacts she had with Brown on that date. We conclude that no such waiver occurred. True, the witness could have asserted the privilege in response to the very first questions, about whether she had seen Brown on the date of the crime and if so, when and where. However, she did invoke the privilege prior to testifying about any conversations she had with the defendant, the length of time that they were together, whether they went anywhere together, when she last saw him on that date, etc. Under the circumstances, we conclude that the mere statement by the witness that she had seen the defendant in Arabi (nowhere near the crime scene) about eight hours before the murder did not constitute a waiver of her right to assert the privilege in response to the additional questions.
Having found that the witness had the right to invoke the privilege against self-incrimination, that she was not required to assert the privilege on a question by question basis and that she did not waive the privilege, we conclude that the trial judge did not err by not requiring Hardeman to testify, once she did assert her fifth amendment privilege. Assignment of error number six lacks merit.

ASSIGNMENTS OF ERROR NOS. SEVEN AND EIGHT
These assignments pertain to the judge's instructions to the jury at the conclusion of the sentencing hearing. In assignment seven, defendant contends that the trial judge erred by not instructing the jury to weigh any mitigating circumstances against any statutory aggravating circumstances before recommending a sentence. In assignment eight, he submits that the judge also erred by not instructing the jury that it was not obliged to recommend the death penalty, and that it could recommend a life sentence in any case in which it found the death sentence inappropriate.
Our review of the record leads us to conclude that the trial court's charge to the jury included instructions which encompassed the principles urged by the defendant. While the judge did not specifically state that the jurors should weigh aggravating and mitigating circumstances in their deliberations on penalty, he did instruct them "not to surrender your honest belief as to the weight and effect of the evidence...." He also advised the jury that it could consider not only statutory mitigating circumstances, but also "any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed." The jury was fairly informed by these instructions that it should consider the weight and effect of all of the evidence introduced at the sentencing hearing, and the failure of the trial judge additionally and specifically to state that aggravating factors should be weighed against mitigating factors was not error. See State v. Jones, 474 So.2d 919, 932 (La.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 2906, 90 L.Ed.2d 993 (1986).
We also find no merit to the proposition that the jury was not instructed that it was not obligated to return a sentence of death. The trial judge advised the jury that it could consider imposing the sentence of death if it found an aggravating circumstance. However, he also told the jury that "[t]he finding of an aggravating circumstance does not mean that you must impose the death penalty." As noted above, the judge stressed that the jurors could consider any relevant mitigating circumstances. Considering the judge's charge in its entirety, "the jury could hardly have failed to understand that there were two sentencing alternatives...."
Jones, 474 So.2d at 933.

CAPITAL SENTENCE REVIEW
Under Louisiana's capital sentencing scheme, this Court independently reviews any sentence of death to determine whether it was excessive. La.Code Crim. Proc.Ann. art. 905.8 (West 1984); La.Sup. Ct.R. 28. In particular, we are required to consider whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors, whether the evidence supports the statutory aggravating circumstances found by the jury and whether the sentence is disproportionate to the penalty *113 imposed considering the nature of the offense and the offender.

PASSION, PREJUDICE OR ARBITRARY FACTORS
We have already considered in this case a number of instances in which the trial judge's decisions should be upheld, or determined that any error was harmless and did not constitute reversible error. On the question of prejudice, the defendant is white and his victim was white. Race was not an issue at trial. After review of the record, we find no evidence of any factor which injected passion, prejudice or arbitrariness into either phase of the bifurcated trial.

AGGRAVATING CIRCUMSTANCES
As previously noted, the jury found two statutory aggravating circumstances. First, the jury found that the death occurred during the perpetration of an armed robbery. La.Code Crim.Proc.Ann. art. 905.4(a) (West 1984). We have already discussed the fact that the evidence fully supports the finding that the defendant committed the murder during the course of an armed robbery.
The second aggravating circumstance found by the jury was that the offense was committed in an especially heinous, artrocious or cruel manner, art. 905.4(g), and the evidence also amply supports this finding. We have held that a murder falls within the category of especially heinous, artrocious or cruel when it is carried out in an inhumane manner that is particularly painful or involves the pitiless infliction of unnecessary pain. State v. Taylor, 422 So.2d 109 (La.), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1982); State v. Moore, 414 So.2d 340 (La.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981). In Moore, Taylor and Clark, this court upheld jury findings that the offenses committed were committed in an especially cruel and heinous fashion where there was the infliction of multiple stab wounds.
In this case, the defendant stabbed the victim thirteen times. Nine of the wounds were on the front of his body and four were inflicted on the back of his body. The pathologist who performed the autopsy on the victim described the wounds as follows:
The man had thirteen stab wounds. Nine of them were on the front of the body. One of them went right through the nose into the nose cavity and down over the lip to the mouth. The second one was over the top of the right shoulder about three and a half inches long and about a half inch deep. The third one went through the chest, down into the chest cavity and pierced the right side of the heart. The fourth one went through the left front of his chest to a depth of about five inches into the lung, the left lung. The fifth one went into the skin and the tissue under the skin of the left chest. The sixth one went through the side of his arm into the arm. The seventh one involved the inner aspect of his arm, and the eighth one went through the left side of his chest, down into his lung to a depth of about two inches. The ninth one was across the lower right chest into the skin, down into the deep tissues of his chest. Four of them were on the back. One was on the upper part of the back and went in to the left lung from behind to a depth of about five inches. Another one went through the back, lower back, and went to a depth of about five and a half inches and went into his heart from behind, went in to the left side of his heart. The twelfth one went into the back of his spine, just to the right of the midline, and the thirteenth one went deeply in the left thigh, on the back of his left thigh, to a depth of five and three-fourths inches.
Considering the evidence of the manner in which the wounds were inflicted, we find substantial support for the jury's finding that the murder was committed in an especially heinous, atrocious and cruel manner.

PROPORTIONALITY OF SENTENCE
Finally, we must determine whether the sentence in this case is disproportionate to *114 the penalty imposed in similar cases from the same parish. While the United States Supreme Court has held that proportionality review is neither constitutionally mandated nor required by its jurisprudence, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), such review is required under this state's statutory scheme. La.Code Crim.Proc.Ann. rule 905.9.1(1)(c) (West 1984). When conducting this review, we consider both the nature of the crime and the defendant.
The state's sentencing memorandum lists sixteen other first degree murder cases in which Orleans Parish juries have voted to impose the death penalty since 1976, when the adoption of a bifurcated trial system for first degree murder was held to be constitutional by the United States Supreme Court. Eight of those cases involved a finding that the offense was committed in an especially cruel, heinous or atrocious manner, and seven involved a finding that the murder was committed during the perpetration of one of the felonies delineated in article 905.4(a).
The imposition of the death penalty in this case does not result in a disproportionate sentence. The defendant brutually killed his victim during the perpetration of an armed robbery. Juries in Orleans Parish have recommended the death penalty under similar circumstances.[9]

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution as provided by La.Rev.Stat.Ann. § 15:567 (West Supp.1987) until
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that Court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari, or
(d) that Court denies his application for rehearing.
CONVICTION AND DEATH SENTENCE AFFIRMED.
DENNIS, J., concurs with reasons.
WATSON, J., concurs and assigns reasons.
DENNIS, Justice, concurring.
I respectfully concur in the decree affirming the conviction and sentence, but disagree with the majority's treatment of the admissibility of prior crimes evidence and the prosecution's warning the defendant's witness to consult her attorney before testifying further. These errors are harmless, however, and the death penalty is warranted because the evidence supports the finding that the defendant was engaged in the perpetration of armed robbery and that the offense was committed in an especially heinous, atrocious or cruel manner.

ADMISSABILITY OF PRIOR CRIMES EVIDENCE

(Assignments Nos. 4 and 5)
According to the rules of evidence, specifically R.S. 15:481 and 483, the state is permitted to introduce testimony of the accused's bad character only in rebuttal of the evidence introduced by him to show good character, and no other investigation into the character of the witness is permissable except to affect his credibility. La.C. Cr.P. article 905.2 expressly provides that the rules of evidence are to govern the sentencing hearing. The language of article 905.2 clearly indicates that unless bad character evidence, including other crimes evidence, is relative to an aggravating or mitigating circumstance, it is admissible against the defendant only according to the rules of evidence. State v. Hamilton, 478 *115 So.2d 123 (La.1985) (Dennis, J., concurring); State v. Sawyer, 422 So.2d 95 (La.1982) (Dennis, J., concurring).
Moreover, our law contains many jurisprudential rules, not the least important of which are the rules adopted by this court in State v. Prieur, 277 So.2d 126 (La.1973), to guarantee due process of law and relevance in the introduction of other crimes evidence. The Prieur guidelines concerning evidence of other offenses should apply in capital punishment proceedings. It would seem that the sentencing phase of a capital case most of all requires notice, fairness, and due process. See Sawyer, supra, at 107-108.

INTIMIDATION OF DEFENSE WITNESS

(Assignment No. 6)
The prosecutor's interruption of Anna Hardeman's testimony and inquiry as to whether she had consulted her attorney concerning her own indictment for first degree murder is a practice which should be strongly reprobated. Such a practice is unconscionable because of the possibility that it may be used to discourage a defense witness from testifying.
Also, it should be emphasized that for a crime to have been committed in an especially heinous, atrocious or cruel manner there must be some element of torture or the pitiless infliction of unnecessary pain. State v. Flowers, 441 So.2d 707 (La.1983); State v. Taylor, 422 So.2d 109 (La.1982). "Torture" requires evidence of serious physical abuse of the victim before death. State v. Sonnier, 402 So.2d 650 (La.1981). The murder must be one that causes death in a particularly painful and inhuman manner. State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Baldwin, 388 So.2d 664 (La.1980). Although the evidence does not clearly indicate the length of time between the stabbing and the victim's death, there is still support for the jury's finding in that there were multiple stab wounds some of which were particularly grotesque.
WATSON, Justice, concurring.
I concur disagreeing only with the implication that in some way the witness may not have had the "right" to claim the Fifth Amendment or that she had waived it; the privilege against self-incrimination is not subject to judicial limitation in my opinion.
NOTES
[1] Only three of defendant's assignments were argued in brief (nos. 1, 2, & 6). During oral argument, defense counsel only addressed assignment six. However, because this case involves the imposition of the death penalty, we have addressed all eight assignments of error, and at some points have discussed potential error not raised by the assignments.
[2] Arguably proof with respect to S-29 is not as strong as the proof of identity offered on the crimes encompassed by S-26 and S-31, since the defendant's mother stated "I think so, but like I said, my memory's no where now" when asked if she recalled the burglary conviction in St. Bernard. However, that answer, combined with the previous answer that she remembered going to court in St. Bernard Parish with her son, was sufficient to allow the jury to conclude that she remembered the conviction.
[3] Regardless of the setting, the state must always provide competent and duly authenticated evidence when it attempts to establish a prior conviction. See, e.g., State v. English, 367 So.2d 815 (La.1979) (hearsay proof of prior murder conviction improperly admitted). Unlike English, where inadmissible testimony was used to establish the prior conviction, the certified court documents were admissible as court records despite their hearsay content. See State v. Nicholas, 359 So.2d 965 (La.1978). The issue here is whether the state needed to provide evidence in addition to the records to establish identity.
[4] The jury was not asked to rely upon any prior conviction or convictions as a basis for finding the existence of an aggravating circumstance under La.Code Crim.Proc.Ann. art. 905.4(c) (West 1981 & Supp.1987), which, at the time of trial (June, 1985), provided that a defendant's "significant prior history of criminal activity" could be considered an aggravating circumstance. That statutory language was found unconstitutionally vague in State v. David, 468 So.2d 1126 (La.1984), cert. denied ___ U.S. ___, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). The statute was amended in 1985 to provide that the jury may find an aggravating circumstance if "the offender has previously been convicted of an unrelated murder, aggravated rape, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or aggravated kidnapping," but this amendment had not become effective at the time defendant was tried and convicted.
[5] In fact, the record implies that the parties and the trial judge were aware of the state's plan to call Mr. Simon as a witness during the penalty phase of the proceeding. When Mr. Simon was called as a witness and defense counsel objected, the judge commented without elaboration that "the court does believe that Mr. Simon's testimony will be admissible at this phase of the hearing," indicating that he knew who Mr. Simon was and why he had been called to testify. We do note that there is no indication in the record that the state gave formal notice to defense counsel of its intent to offer evidence pertaining to prior crimes during the penalty phase. In State v. Hamilton, 478 So.2d 123, 132 (La.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986), we held that "fundamental fairness dictates that an accused receive adequate prior notice that evidence of unrelated criminal activity may be offered by the prosecutor in an effort to punish him for the charged crime," and set aside the death penalty verdict upon finding that the state's failure to provide the defendant with notice of its intent to introduce evidence of an alleged prior offense for which the defendant had not been convicted violated defendant's due process rights. Hamilton also held that La.Code Crim.Proc.Ann. art. 720 (West 1981), which requires the state to give pre-trial notice of its intent to use other crimes evidence at trial, is applicable to the penalty phase of a first degree murder trial. However, we have subsequently found that the state's failure to give formal notice of its intent to offer prior crimes evidence during the penalty phase of a defendant's trial was not reversible error in a situation where it was "logical to conclude" that "the defendant was not surprised by the introduction of the evidence," State v. Ward, 483 So.2d 578, 587 (La. 1986), and where the defendant "does not contend his strategy would have been different had he been aware of the allegedly nondisclosed evidence." Id. at 588, quoting State v. Rault, 445 So.2d 1203, 1215 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). Here, the defendant does not even raise the argument of lack of notice, much less contend that his strategy would have been different if notice had been given. Thus, any failure by the state to formally advise the defense of its intent to use evidence of prior crimes during the penalty phase would not, under the circumstances of this case, constitute reversible error.
[6] The privilege against self-incrimination embodied in the Fifth Amendment to the United States Constitution is also assured by Article I, § 16 of the Louisiana Constitution (1974), which provides that "No person shall be compelled to give evidence against himself." The federal constitutional principle was made applicable to the states in Malloy v. Hogan, 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653, 661 (1964).
[7] The defendant's position was that testimony from Hardeman that Brown was intoxicated or on drugs on the day of the murder would have helped establish a mitigating factor in the penalty phase under La.Code Crim.Proc.Ann. art. 905.5(e) (West 1984).
[8] Defense counsel contended at oral argument that Hardeman had "cut a deal" with the state prior to Brown's trial by agreeing to plead guilty to a lesser charge (accessory after the fact), and thus in reality had nothing to fear from self-incrimination at the time of the trial. At the same argument, the assistant district attorney denied that any plea bargaining agreement with Hardeman was finalized at the time of trial, and stated that, to the contrary, plea bargaining negotiations with Hardeman had broken down. In any event, the assertions of defense counsel go beyond the record and cannot be considered by this court on appeal. The defendant did not move for a new trial on the ground that Hardeman had reached a firm plea bargaining agreement at time of trial, and we do not reach the question of whether her right to invoke the Fifth Amendment would have been affected had such an agreement been reached.
[9] See, e.g., State v. James, 431 So.2d 399 (La.), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Marshall, 414 So.2d 684 (La.), cert. denied, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982); State v. Brown, 414 So.2d 689 (La.1982). In Marshall and Brown, the death penalties were set aside for reasons unrelated to proportionality.