767 So.2d 772 (2000)
STATE of Louisiana
v.
John BASS.
No. 99-KA-0388.
Court of Appeal of Louisiana, Fourth Circuit.
June 14, 2000.
Opinion Denying Rehearing July 12, 2000.
*773 Harry F. Connick, District Attorney of Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr., and Judge PHILLIP C. CIACCIO, Pro Tempore.
BAGNERIS, Judge.
On November 18, 1994, John Bass, the defendant was charged by bill of information with simple burglary in violation of La. R.S. 14:62. He was arraigned November 28, 1994, and pled not guilty. On May 17, 1995, the trial court denied the motion for appointment of a sanity commission. Bass was found guilty of attempted simple burglary on May 17, 1995 in violation of La. R.S. 14:27(62). The State filed a multiple bill.
On September 14, 1995, the trial court granted a motion for a sanity commission. On September 26, 1995, Bass was found competent to proceed. On January 5, 1996, the trial court found Bass to be a fourth offender. On January 11, 1996, Bass was sentenced pursuant to State v. Dorthey, 623 So.2d 1276 (La.1993), to three years with credit for time served. The State sought writs to this Court, and this *774 Court granted the application, vacated the sentence and remanded for resentencing. State v. Bass, 96-0168 (La.App. 4 Cir. 4/15/96), unpub. This Court reasoned that the trial court failed to state sufficient reasons for departing from the mandatory minimum sentence under the Habitual Offender Law.
The case was continued many times, almost every time on motion of Bass. On April 25, 1997, defense counsel moved for new trial on the multiple bill which motion was granted. The trial judge stated that Dorthey was no longer available to him, that he originally encouraged Bass to plead guilty to the multiple bill because he thought the State would agree to the lesser sentence, and that on further scrutiny, he saw a flaw in the multiple bill.
On January 28, 1998, the State filed a second multiple bill. On February 27, 1998, the defendant was released from custody. He was arrested May 14, 1998. On June 24, 1998, the court, with a new judge sitting ad hoc, reversed its ruling on the motion for new trial of April 25, 1997, and found Bass to be a fourth offender. On September 11, 1998, Bass was sentenced to twenty years at hard labor. Bass filed a motion to reconsider sentence, which was denied. Bass filed a motion for appeal.

FACTS
David Landry, a police officer with the L.S.U. Medical Center, testified that he was in the security office using a surveillance camera on October 30, 1994. He saw a man later identified as Bass, and a woman walking toward the residence hall. There was no other activity in the area. The couple turned and started walking toward Hotel Dieu Hospital. The woman went in, and the man kept walking. Then the man walked back toward the residence hall. Along the way, he started looking in parked cars. Landry alerted Officer Jimmy Jackson at the Medical Education Building. The van alleged to be the subject of this crime happened to belong to Jackson. Landry saw Bass open the driver's door and get in. Landry called Jackson again, but before he could get him on the phone, he saw Jackson running and yelling. Bass got out of the van and started running. Landry alerted Sergeant Brown, the night supervisor. Brown and Landry jumped in the patrol car, chased Bass, and apprehended him three and half blocks away.
Jackson said he saw Bass get into the van, which was unlocked. Jackson went out of the building and saw Bass in a crouched position rummaging through the van. Jackson's eyeglass case had been thrown on the floor, his cassette tapes had been thrown about, and the tape in the tape player had been pulled out, damaging the tape player. He testified the Bass was only in the van for one minute and that nothing was taken. The glove compartment was locked, there were no burglary tools present; the steering column was not broken, nor were any windows. The car had been unlocked. He had not given Bass authority to enter the van.
Officer Todd Henry testified he arrested Bass. He examined the van and found no damage, no broken glass, and no burglary tools. The radio had not been tampered with and the steering column had not been broken. However the interior of the van had been ransacked.
Annette Williams testified for the defense that she is the Bass' girlfriend and that they lived together. She and Bass had gone to the hospital because her daughter Tyronda was having a baby. The daughter was having trouble delivering the baby and entered the hospital the day before. The daughter had in fact been in the hospital three times. Annette Williams received a call from her mother Lola Williams on the morning of the incident informing her that Tyronda was having the baby. She and Bass went to the hospital at 4:00 a.m., but the child had been delivered. Because there was a limit to the number of visitors that were allowed, Bass left, and she stayed. Both she and Bass were fatigued. She identified a *775 certificate of live birth reflecting that a Terrance was born at 4:00 a.m.
Bass testified that he had walked to the hospital from his house on South Robertson three times over a period of two and a half days. The hospital informed him that only family members could wait in the waiting room. He left, walked down the street, got into the van, sat down and fell asleep because he was exhausted. He had not slept in two days. Fifteen minutes later, he was awakened. He had never intended to steal anything from the van.
Bass admitted he was convicted of a crime in 1970 of carrying a weapon; a 1971 conviction for simple robbery; a 1977 conviction for theft of under $100.00; a 1977 conviction for simple battery; three convictions for misdemeanor theft in 1978, 1979, and 1982; a 1985 conviction for cocaine possession; and charges in 1991 and 1992 for misdemeanor theft.

ASSIGNMENT OF ERROR ONE
Bass argues the evidence was insufficient to support the conviction. Specifically, he argues that the evidence was insufficient to support a finding of intent to commit a felony therein. He argues, as he did at trial, he was only looking for a place to sleep when he entered the van.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs. In Jacobs, the Louisiana Supreme Court reviewed the sufficiency of the evidence to support a conviction for simple burglary where a "place to stay" defense had been presented. In that case, the Court stated:
To support a conviction of simple burglary under La.R.S. 14:62, proof of the defendant's presence in a building by means of an unauthorized entry is not alone sufficient. State v. Jones, 426 So.2d 1323 (La.1983). The prosecution must also prove beyond a reasonable doubt the intruder's intent to commit a theft or felony therein.
In State v. Marcello, 385 So.2d 244 (La. 1980), the defendant was seen in the hallway of a public utility's office building. The security guard that spotted the defendant had been attracted by the sound of running water in the restroom. The defendant ran back into the restroom and climbed out of a window, but was quickly apprehended by police. The defendant explained that he had slept on the roof and had entered the building to wash up in the restroom. The security guard, who had cleaned the restroom earlier, found fresh dirt and debris in the restroom, indicating that someone had just washed up there. The defendant did not have any burglary tools or stolen property in his possession. This court, noting that the defendant's flight under the circumstances did not necessarily indicate that he had intended to commit a theft or felony in the building he had entered without authority, held that the evidence was insufficient to support the conviction of simple burglary. Jacobs, 504 So.2d at 820.
*776 In Jacobs, the police were inside a residential building leased by Mrs. Evelyn Vicks. The two officers, responding to a report of a burglary in process, saw someone with a flashlight inside the dark building. When the police entered the building with a dog, they found relator under the kitchen table. Relator's brother was found in the bedroom under the only bed in the house. Food was found on the kitchen table. A chisel, a screwdriver and a flashlight were also found on the floor of the bedroom near the bed. According to the police, someone had apparently slept in the bed.
Mrs. Vicks had rented the house two months earlier. Although she had moved many of her belongings, including a radio, stereo equipment, appliances and furniture, into the house, she had not yet begun to occupy the house. Most of her things were still in boxes. Mrs. Vicks testified that she kept all of the doors locked and that the utility company had not turned on the electricity and gas.
She further testified that she had never prepared or kept food in the house and had never eaten nor slept there. She denied that the flashlight was hers. She conceded, however, that her husband, a roofer, kept many tools in a toolbox in the kitchen and that the screwdriver and chisel might belong to him. She also verified that a friend had used some tools to reassemble the bed after it had been moved into the house. She found nothing missing from the house and nothing in disarray except the bed and a basket of clothes which had been moved.
Relator's brother testified that he had just returned to Baton Rouge after working in another area for a year and had been told that the police were looking for him. He was familiar with the house leased by Mrs. Vicks because one of his friends had previously rented it. When he noticed that someone had moved into the house but wasn't living there, he decided to stay there temporarily and entered through the rear door, which he claimed was not locked. He testified that he had stayed in the house for three days prior to being arrested and had been supplied with food by his brother. He admitted he had brought the flashlight into the house, but denied ownership of the tools found on the bedroom floor.
After relator and his brother were tried jointly on charges of burglary of an inhabited dwelling, the jury returned a responsive verdict of guilty of simple burglary. In denying relator's motion for a new trial, the trial court expressly ruled that the evidence of intent was sufficient. The Court of Appeal affirmed. As to the issue of sufficiency of the evidence of intent, the Court reasoned as follows:
The totality of the circumstances presented, in this case, as well as defendants (sic) lack of employment, past records, possession of tools customarily used for break-in, the impeached credibility of the defendant who testified, when considered in totality, clearly provides a reasonable basis for the jury's findings of intent on the part of defendants to commit a theft or felony.... [O]ne of the defendants in the instant case was found with tools that could certainly be considered burglary tools beside him under the bed. The trial jury apparently found the testimony of Mrs. Vicks and the police officers credible, and that of Percy Jacobs not credible. It was established that defendant gained entrance through a locked door. The defendants were discovered hiding in the dwelling, items belonging to Mrs. Vicks had been tampered with, and defendant's own testimony established that he had been involved in or that the police were looking for him `for another burglary.' The totality of these circumstances is clearly sufficient to support the jury's finding that these defendants made an unauthorized entry into another's dwelling with the specific intent to commit a theft." Id. at 1019. Jacobs, 504 So.2d at 818-819.
*777 The Supreme Court disagreed that the evidence of intent was sufficient to support the conviction of burglary and reversed. The Court explained the reasoning behind its decision to reverse as follows:
In the present case, the circumstances relied on by the court of appeal as proving intent simply do not exclude every reasonable doubt as to the intent element of simple burglary. Whether the entry was through a locked or an open door is of no significance to the intent issue. The finding of tools customarily used for break-ins also bears primarily on the conceded issue of unauthorized entry. The fact that the intruders were hiding when apprehended inside the house merely indicates a consciousness of guilt of criminal trespass and does not necessarily indicate an intent to steal. The fact that relator's brother had been told the police were looking for him "for another burglary" proves nothing as to relator's intent to commit a theft or felony when he made the unauthorized entry here. There was no evidence before the jury as to relator's lack of employment or past criminal record. The impeached credibility of relator's brother does not supply affirmative evidence of guilt, but rather provides only a basis for an appellate court reviewing the sufficiency of evidence to disregard the particular testimony so that there is no probative value either way. Finally, the intermediate court's observation that items belonging to Mrs. Vicks had been tampered with is an overstatement of the evidence....
Because of the difficulty of proving the intent element of simple burglary in La. R.S. 14:62, the Legislature in 1983 and 1986 added La.R.S. 14:62.3 and 62.4, creating the crimes of unauthorized entry of an inhabited dwelling and unauthorized entry of a place of business. These crimes, which do not require proof of intent as an essential element of the crime, have a range of sentence up to six years and fill the gap between simple burglary (range of sentence up to twelve years) and criminal trespass (range of sentence up to ninety-one days). The crime of unauthorized entry of an inhabited dwelling is now included as a responsive verdict for an indictment charging simple burglary of an inhabited dwelling, and the crime of unauthorized entry of a place of business is now included as a responsive verdict for an indictment charging simple burglary. La.C.Cr.P. art. 814 A (44.1) and (44). However, since these crimes were not in existence when relator's offenses were committed, this court cannot modify the verdict pursuant to La.C.Cr.P. art. 821 and render a judgment of conviction of the lesser included responsive offense of unauthorized entry of an inhabited dwelling. Jacobs, 504 So.2d at 820-822.
Jacobs and Marcello were contrasted in State v. Winslow, 29,888 (La.App. 2 Cir.1997), 702 So.2d 22, under facts strikingly similar to this case. There, the relevant facts were as follows:
[Police Sgt. R.B. Wyche] noticed a man ambling through the parking lot across the street, peering into the cars he passed. Considering this suspicious, Sgt. Wyche radioed the head of. Security, Police Sgt. Danny Fogger, and decided to follow the man on foot; he lost sight of the man for a few seconds. However, after rounding the corner onto Milan Street, Sgt. Wyche saw the suspect rummaging around in the back of a beige, older-model Chevy van. He radioed for assistance and walked up to the van, where the suspect now had his hands on the radio in the dashboard. Apparently startled by the sound of the police radio, the suspect hopped out the driver's door. Sgt. Wyche ordered him to stop, but he bolted down Milan Street and turned south on Louisiana Avenue....
Cpl. D.E. McDaniels saw the suspect on Louisiana Ave. and apprehended him. He testified that the suspect was hostile, requiring two extra officers to be subdued. Cpl. McDaniels testified that the *778 suspect smelled of alcohol, but was not drunk or incoherent; he had a cut to his head, where he had slipped and fallen during the chase (which Sgt. Wyche had observed)....After receiving his Miranda rights, Winslow told Cpl. McDaniels that a white woman had asked him to come into the van to have sex with her. Later, he changed his story to say he "did the burglary," but complained that the police "didn't have to beat me up so much."
Cpl. McDaniels investigated the van and found compartments for coins and other small objects in the console had been opened, indicating a search for valuables. He also found that the knobs to the radio had been pulled out all the way, a telltale first step in the theft of an in-dash radio.
The driver of the van, Mrs. Mourning, testified that she parked it in front of an office at 631 Milan Street, where she cleaned in the evenings. She did not lock it because the lock was broken. After police notified her, she found the door taken off the refrigerator in the rear of the van, the C.B. radio pulled out of place but not removed, and all the papers taken out of the glove compartment; the van had not been in this condition when she left it earlier. Nothing was actually stolen; as she understood, the police interrupted the burglar. Mrs. Mourning further testified that she was not the registered owner of the van; the owner was her boyfriend, Artie Hill, who gave no one permission to enter it except her, and she gave no one, including Winslow, permission to enter it or remove its contents. Winslow pp. 1-2, 702 So.2d at 23-24.
The Winslow court found that the evidence was sufficient based on the fact that the van had been ransacked, the radio had been partially removed, and the defendant fled when confronted. The Winslow court further found that "place to stay theory", which was recognized in Jacobs and Marcello in the context of a vacant house was simply not persuasive. The court reasoned that the evidence overwhelmingly showed that the defendant tried to remove the in-dash radio and C.B., took the door of the refrigerator and rummaged through closed compartments where valuables are normally stored. The court found that none of these actins were consistent with seeking shelter. Rather, the court reasoned, these actions were consistent with the intent to commit theft.
In the case at bar, the evidence showed that the van had been ransacked, a glass case knocked to the floor, and tapes thrown into disarray. Bass testified that he had been asleep in the van for fifteen minutes, but the testimony of two officers established that Bass accomplished destruction to the van in less than one minute. He was found, not in a sleeping position, but in a crouching one. He fled when confronted. These facts are sufficient to support a conviction for simple burglary. Bass was in fact convicted of the lesser-included offense of attempted simple burglary.
La.C.Cr.P. art. 814; La. R.S. 14:27(62). An attempt occurs when "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27. The State clearly proved an attempted simple burglary. The evidence was sufficient. This assignment of error has no merit.

ASSIGNMENTS OF ERROR TWO THROUGH FIVE
Bass complains of his adjudication as a multiple offender and of his sentence of twenty years. Before addressing the merits of the arguments, the court must first determine whether the issues raised have been preserved for appeal. The Louisiana Supreme Court revised the scheme of allocating burdens of proof in habitual offender proceedings in State v. Shelton, 621 So.2d 769 (La.1993). The court stated:
If the defendant denies the allegations of the bill of information, the burden is *779 on the State to prove the existence of the prior guilty pleas and counsel represented that defendant when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a `perfect' transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers.
If the State introduces anything less than a `perfect' transcript, for example, a guilty plea form, a minute entry, an `imperfect' transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendants prior guilty plea was informed and voluntary, and made with an articulated waiver of three Boykin's rights. We note that this new procedure will not only give appropriate significance to the presumption of regularity which attaches to judgments of conviction which have become final, but will also provide an advantage to defendants who were previously under Lewis unable to introduce any extra-record evidence and whose guilty pleas were heretofore under Tucker found constitutionally valid by mere proof of a minute entry and a guilty plea form. Shelton, 621 So.2d at 779-780.
Following Shelton, the Louisiana Legislature amended La. R.S. 15:529.1(D)(1)(b) to place the burden of challenging a predicate conviction in a multiple bill proceeding on the defendant. That subsection now provides, and provided at the time of the multiple bill hearing: Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor.
A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
In this case, Bass did not file a written objection. However, the case, as set out above, presents a very unusual procedural history. The original sentence of three years was a markedly reduced sentence from the statutory minimum. Although Bass did not plead guilty to the multiple bill, the hearing that was held was rather perfunctory, and the parties and the court evidently had in mind that the defendant would receive a substantially reduced sentence. Bass therefore had no impetus to file a written objection to the multiple bill. When this Court granted writs and remanded for re-sentencing, defense counsel filed a motion for new trial. The motion was not written, but was in fact granted by the trial court and the court stated in fact that it saw a flaw in the multiple bill.
Addressing the merits of the arguments raised, Bass first argues the evidence *780 was insufficient to support a finding that he was a fourth offender. The first bill of information filed listed the three priors as cocaine possession in case # 306-670G, theft in case # 299-264H, and theft in case # 267-910H.
The second bill lists the same first two of the above, but lists the third as theft in case # 286-879H. Bass complains that there was insufficient documentation of prior convictions, there was no evidence of discharge dates and lapses between convictions, and there was insufficient evidence of identification. The State responds that the Assistant District Attorney at the hearing on January 5, 1996, indeed failed to introduce any evidence of a cocaine conviction in case # 306-67OG which was entered September 11, 1985. The appellate counsel checked the file and found that the State had certified copies and a transcript relating to the guilty plea in that case, but concedes they were not introduced. Instead, the State's evidence sufficiently proved three prior convictions for felony theft, all guilty pleas: one in case # 267-910H entered February 16, 1982, and two entered February 28, 1984: one in case # 299-264H and the other in case # 298-254H. However, the conviction in case # 298-254H was never charged on the multiple bill.
The motion for new trial was granted on the first multiple bill of information and then reversed, and the finding that the defendant, was a fourth offender was reinstated without a second hearing on the merits. There was never a hearing on the second bill of information filed, which listed the convictions in cases # 306-670G, 299-264H and 286-879H. As such, it appears that the second multiple bill of information filed was meaningless. Since there was no documentation regarding the conviction in case # 306-670G introduced at the only hearing on a multiple bill, Bass is correct that the evidence was insufficient to support a finding that he was a fourth offender, and the State concedes this point.
Bass argues the State failed to prove that the seven-year cleansing period between convictions had not passed. The cleansing period in effect at the time of the defendant's crime, October 30, 1994, was seven years pursuant to La. R.S. 15:529.1 provided:
This section shall not be applicable in cases where more than seven years have elapsed since the expiration of the maximum sentence or sentences of the previous conviction or convictions, adjudication or adjudication of delinquency, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any seven-year periods.
This "cleansing period" begins to run from the date that a defendant is actually discharged from state custody and supervision. State v. Anderson, 349 So.2d 311. Here, again there is a question of whether the issue has been preserved for appeal. In State v. Jones, 940071 (La.App. 4 Cir. 3/29/95), 653 So.2d 746, this court stated that the defendants failure to make a contemporaneous objection to the lack of a discharge date for the prior offense precluded appellate review. But in State v. Boykin, 29,141 at p. 14, 688 So.2d at 1258, the Second Circuit treated the lack of proof of a discharge date as an error patent on the face of the record and vacated the multiple offender adjudication. In concluding that it was an error patent, the court cited State v. Bullock, 311 So.2d 242 (La.1975) and State v. Baker, 452 So.2d 737 (La.App. 1st Cir.1984).
In Bullock, the Supreme Court reversed the defendant's multiple offender adjudication because there was no proof that the five-year cleansing period had not elapsed. The dissent noted that the defendant had not raised this issue in his bills of exception. In Baker, the defendant assigned *781 as error the failure of the State to prove that the five year cleansing period had not elapsed although he had not raised the issue in the trial court. The First Circuit considered the issue because the allegation, if true, would be an error patent under La.C.Cr.P. art. 920. (La.1977); State v. Metoyer, 612 So.2d 755 (La.App. 5 Cir.1992).
The state has the burden of proving the date of defendant's discharge from state supervision. However, if less than the cleansing period has elapsed between the defendant's conviction on a predicate felony and his commission of a subsequent predicate felony, the State need not prove the date of discharge on the earlier sentence in the multiple offender proceedings. State ex rel. Clark v. Marullo, 352 So.2d 223 (La.1977).
In the present case, the State introduced absolutely no evidence regarding the 1985 cocaine conviction, much less the date of the Bass' release. Even with the 1985 conviction for cocaine in 306-670G, there is a serious issue as to whether the State proved that the seven-year cleansing period then in effect pursuant to La. R.S. 15:529.1(D) had not passed before the commission of this crime. However, without that conviction, the State had the burden of proving that seven years had not elapsed between the release of Bass for the 1984 theft conviction and his arrest ten years later for this crime in 1994. In fact, it appears that Bass would necessarily have had to have been released from the 1984 conviction before 1985 for him to have been arrested on a cocaine charge that year. The State appears to concede that it did not carry its burden of proof. As such, this court must vacate the entire multiple bill adjudication rather than simply holding that although the State did not prove that Bass was a fourth offender (without the documentation on the cocaine conviction), it did at least prove that he was a third offender.
Bass argues that the State failed to prove his identity in the prior convictions. The Court will note that this issue was preserved for appeal. In State v. Picot, 96-2387, p.7 (La.App. 4 Cir. 7/1/ 98), 718 So.2d 517, 521, this Court stated:
The State notes Picot did not file any written objections to the multiple bill. However, any written objections would necessarily go to the sufficiency of the State's evidence to prove the prior conviction. Picot would have no way of knowing prior to the hearing that the State would fail to present any evidence to prove identity. Because the State failed to present any evidence of identity, and Picot specifically noted he was not admitting his identity, the State failed to meet its burden at the multiple bill hearing. As noted by this court's decision in State v. Henry, 96-1280 p. 7 (La. 4 Cir. 3/11/98), 709 So.2d 322, 325-26: "To obtain a multiple offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. State v. Hawthorne, 580 So.2d 1131 (La.App. 4th Cir. 1991)." See also La. R.S. 15:529.1; State v. Brown, 514 So.2d 99 (La.1987).
Addressing the merits of the argument, in State v. Neville, 96-0137, p.7 (La.App. 4 Cir. 5/21/97), 695 So.2d 534, 538-539, this court stated:
To obtain a multiple offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. State v. Hawthorne, 580 So.2d 1131, 1133 (La.App. 4th Cir.1991). The defendant's identity may be shown by a variety of methods, including the testimony of witnesses, expert opinion regarding the fingerprints of the defendant when compared with those in the prior record, or photographs in the duly authenticated record. State v. Curtis, 338 So.2d 662, 664 (La. 1976). Establishing that the defendant's name and that of the person previously *782 convicted is the same is insufficient evidence of identity under R.S. 15:529.1. Id.

In this case, the State called a fingerprint expert who testified that he had taken the defendant's fingerprints the morning of the hearing. He identified an arrest register in case # 299-264H; the bill of information, the guilty plea form, the docket master, the minute entry, and the arrest register in that case; an arrest register in case # 267-910H; and the bill of information, the guilty plea form, the docket master, and the arrest register in that case. He testified that the fingerprints on Exhibits One, Two, and Four matched. He then identified the arrest register in case # 298-954 and the bill of information, the guilty plea form, the docket master and the arrest register in that case.
In State v. Langlois 96-0084 (La.App. 4 Cir. 5/21/97), 695 So.2d 540, writ granted on other grounds and remanded, 97-1491 (La.11/14/97), 703 So.2d 1281, this Court discussed the factors needed to determine whether the State proved beyond a reasonable doubt that the defendant was convicted of a predicate offense. This Court reviewed jurisprudence that had developed on this issue. In State v. Armstead, 542 So.2d 28, 30 (La.App. 4th Cir.1989), writ denied, 566 So.2d 391 (La.1990), the defendant was convicted of being a convicted felon in possession of a firearm.
On appeal, he argued the State had not proved the predicate offense of attempted simple burglary. To prove the prior offense, the State introduced an arrest register with the defendant's name, the date of the arrest, the place of arrest, the crime and date of the crime, the place of the crime, and the victim. On the back of the arrest register were the fingerprints of the arrestee and the notation "252-781 Art. 27 (62)." The State introduced a true copy of the Bill of Information in proceeding No. 252-781 charging defendant with the crime of attempted simple burglary on December 18, 1975, and minute entries showing he was found guilty as charged on February 2, 1977, and sentenced on February 9, 1977 to five years. The Court held that even if the notation on the back of the arrest register could not be used to prove the connexity between the December 18, 1975 arrest register and the Bill of Information, "the specifics and details" of the crime given on the documents were sufficient under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In State v. Brown, 514 So.2d 99, 106 (La.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), the Louisiana Supreme Court considered the level of proof necessary to establish a prior conviction under the multiple offender law. The Court determined that a defendant's name is not sufficient to prove that he is the same person who was convicted of prior crimes and declared:
While it is permissible for the state to introduce certified copies of court records evidencing prior convictions, we have determined that § 15:529.1 requires independent proof that the defendant was the same person identified in the records. The state may establish proof of identity in various ways, such as the testimony of witnesses to prior crimes, expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding, or photographs contained in a duly authenticated record. [Citation omitted] 514 So.2d at 106. Langlois, 8-9, 695 So.2d at 545-546. In Langlois, the defendant's fingerprints were not on the arrest register. The fingerprints were on a separate card. The only link to the crime on the card and arrest report was that both had the same date of arrest. However, there were many other identical specifics and details, including defendant's name and date of birth and identification numbers. This Court determined that the many identical specifics and details of the fingerprint card and the arrest report were substantial enough to prove identity beyond a reasonable doubt and were sufficient to support the multiple bill.
*783 In the present case, Bass' birthday was shown to be February 17, 1952, and his date of arrest as November 8, 1983. He was booked with two counts of theft, one count of attempted theft, and one count of criminal damage to property. The attempted theft count specifically lists automobile tires as the object of the theft, and another count lists "Theft from exterior of an auto in the amount of $200.00." The bill of information states that the defendant "committed a theft of two (2) tires and four (4) hubcaps of the total value of Two Hundred ($200.00) Dollars...." The bill of information contains the case number, as does the plea of guilty form to theft. The docket master shows the same birthday as the arrest register and the same case number, identifies the crime as theft, and lists the arrest date that was listed on the arrest register. This evidence appears sufficient to prove that Bass was the same person convicted in case # 299-264H.
Bass was shown to have been arrested on December 2, 1978, and his crime as one count of possession of stolen property and one count of theft of stolen property. A minute entry of his sentencing introduced in Exhibit Five shows he was incarcerated beginning December 2, 1978. A screening sheet that was evidently also introduced into evidence that showed that the object of the theft was property valued at $17.00. The transcript of his plea of guilty contains a statement by the court that on December 2, 1978, he committed theft of property valued at $17.00 from A & P Food Store. Bass' social security number was shown to be # XXX-XX-XXXX, his driver's license number as # 4095861, and his address as 3307 South Robertson, New Orleans, Louisiana. The evidence sufficient to prove that Bass was the same person convicted in both case # 267-91 H and case # 299-264H. As in Langlois and Armstead, the identical specifics and details contained in the arrest registers, bills of information and docket masters are substantial enough to prove identity beyond a reasonable doubt and are sufficient to support the multiple bill of information. This argument is without merit.
Bass argues that after the motion for new trial was granted and that the State's motion for reconsideration of the granting of new trial was the incorrect procedural device. While this argument may be technically correct, the State is free to file a multiple bill, or any number of multiple bills, at any time it chooses. The State could easily have filed a new multiple bill (which it in fact did) and have had the sentencing issue "reheard" or "reconsidered." However, as pointed out earlier, no second hearing was in fact ever held, leading to the mistakes outlined by Bass' other arguments.
Bass complains that he had already served his sentence when he was rearrested. La. R.S. 15:529.1(D) specifically provides, in pertinent part, that "If, at any time, either after conviction or sentence, it shall appear that a person convicted of a felony has previously been convicted of a felony.... The district attorney... may file an information accusing the defendant of a previous conviction...." Thus, the statute allows filing a multiple bill of information after sentence is imposed.
Bass cites State v. Broussard, 416 So.2d 109 (La.1982), in which the Louisiana Supreme Court held that a habitual offender bill must be filed within a reasonable amount of time after the State becomes aware of the defendant's prior felony record because a defendant is entitled to know the full consequences of the verdict within a reasonable time. Thus, the real issue presented by this argument is not that the defendant should not have been re-arrested and re-sentenced after he was released, but whether the State timely filed the multiple bill. Bass was notified by the State of it's intent to file a multiple bill which was evidently almost immediately after he was convicted. He was convicted May 17, 1995, and the multiple bill is mentioned in the minute entries as early *784 as July 11, 1995. Although the bill itself is stamped that it was filed January 5, 1996, Bass was on notice immediately upon verdict that the State would file a multiple bill. Secondly, when the defendant was released from custody, he was in fact wrongly released. At the time of his release, this Court had remanded the case to the trial court for re-sentencing, and the trial court had granted a motion for new trial on the multiple bill, which was still pending. Lastly, any delays in the multiple offender adjudication are directly attributable to Bass who moved for, and was granted, no less than ten continuances.
Bass argues his twenty-year sentence is excessive. That issue is now moot because the adjudication as a fourth offender must be reversed for the reasons set out above, and the case remanded for re-sentencing.
Accordingly, the defendant's conviction is affirmed. We reverse the multiple offender adjudication and remand for resentencing.
CONVICTION AFFIRMED; MULTIPLE OFFENDER ADJUDICATION REVERSED AND REMANDED FOR RESENTENCING.

ON APPLICATION FOR REHEARING
BAGNERIS, Judge.
Counsel for defendant filed an Application for Rehearing on June 19, 2000. After a careful review of the record in this matter, we deny this application. Our reasoning is discussed more fully herein below.
A review of the minute entries and the docket master reveals that contrary to counsel's assertion, the defendant was not released on October 28, 1997. The minute entries of December 19, 1997, January 23, 1998, and January 28, 1998, all indicate that the defendant was remanded after each of these hearings. The defendant could only be remanded if he was in jail at the time of the hearings. The minute entry of February 27, 1998 indicates that the defendant was released on that date. There is no indication on the docket master that the defendant was released in October 1997 and then somehow re-arrested before the December 19th hearing. In any event, even though the second multiple bill was not filed until January 1998, the matter of the "new trial" on the first multiple bill was still being heard by the court. Indeed, it was for this reason that the court continued to reset the case, mostly at the behest of the defendant. Thus, even if the defendant had been released in October 1997, the new hearing on the first multiple bill was still pending. However, there is nothing in the record to support counsel's claim that the defendant was released in October 1997. The record plainly shows that he was released in February 1998, after the second multiple bill was filed. Thus, there is no Broussard problem. See State v. Broussard, 416 So.2d 109 (La.1982).
With respect to counsel's assertion that the delays in the multiple bill hearing were the fault of the State from April 1997 to April 1998, the minute entries reflect that almost all of the continuances granted during this time period were at the request of defense counsel. The first continuance, that of April 25, 1997, was at the State's request. The minute entry for the second continuance, April 28, 1997, does not designate who asked for the continuance. However, every continuance after that, through the time the defendant was released in February 1998, was at the behest of the defendant. This is revealed by the minute entries of the following dates: May 16, 1997, May 27, 1997, June 20, 1997, July 28, 1997, September 11, 1997, December 19, 1997, January 23, 1998, January 28, 1998, and February 27, 1998. Only two of these minute entries  May 20, 1997 and July 28, 1997  show that the continuances were jointly requested by the defendant and the State. After the defendant's release on February 27, 1998, the matter was reset *785 until April 17, 1998, when the defendant failed to appear, and a capias was issued. The docket master reveals that the defendant was re-arrested on May 14, 1998, and the defendant appeared in court on May 22, 1998. The matter was reset for June 24, 1998, and on that date, the State moved the court to reconsider its granting of the motion for new trial. The court granted the State's motion; vacated its ruling granting the new trial; found the defendant to be a multiple offender; and reset the case for sentencing. The next five continuances were granted at the defendant's request. This is indicated by the minute entries for the following dates: June 26, 1998, July 10, 1998, July 17, 1998, July 31, 1998 and August 28, 1998. The defendant was sentenced on September 11, 1998. Thus, the record reflects that the delays were almost entirely caused by the defendant, either in the form of motions to continue or because of his failure to appear and his being at large.
The fact that the delays were mostly occasioned by the defendant defeats his argument that the court lost jurisdiction to sentence him under La.C.Cr.P. art. 874. The defendant argues that the court waited too long after this Court's remand to sentence him. In support of this argument, he cites various cases. However, in each of these cases, the delay in sentencing was either due to court error, in that the court forgot to sentence the defendant (See City of Baton Rouge v. Bourgeois, 380 So.2d 63 (La.1980); State v. Milson, 458 So.2d 1037 (La.App. 3 Cir.1984); State v. Davis, 542 So.2d 856 (La.App. 3 Cir.1989); and State v. Quinney, 543 So.2d 1050 (La. App. 3 Cir.), writ denied, 545 So.2d 1040 (La.1989)), or to the State's failure to file the multiple bill within a reasonable time after conviction (See State v. McQueen, 308 So.2d 752 (La.1975)).
Here, by contrast and as noted above, the delays were almost all caused by continuances requested by the defendant or due to his failure to appear and to his being at large. These facts place this case closer to those cases cited by defense counsel in which the courts found the delays, caused by the defendants, did not divest the trial courts of their jurisdiction to sentence the defendants. See State v. Williams, 95-1842 (La.App. 1 Cir. 9/27/96) 681 So.2d 77; City of Winnfield v. Weems, 545 So.2d 717 (La.App. 2 Cir.1989); and State v. Christmann, 96-888 (La.App. 5 Cir. 3/12/97), 692 So.2d 1155.
In sum, there is nothing in the record to show that the defendant was released prior to February 27, 1998. By that time, the second multiple bill had been filed, and even up until January 1998, the "new trial" on the original multiple bill was pending and had been continued mostly at the behest of the defendant. Most of the continuances from the time of the defendant's release in February 1998, until sentencing in September 1998, were requested by the defendant or caused by his absence. Because most of the delays were caused by defense continuances or by the defendant's failure to appear and his being at large, the trial court, under La.C.Cr.P. art. 874, did not lose jurisdiction to sentence him.
The application for rehearing does not present any justification for changing this Court's June 14th ruling. Therefore, this rehearing application is hereby denied.
REHEARING APPLICATION DENIED.