h DAVID S. GORBATY, Judge.
On August 5, 1997, George Porter was charged by a three count bill of information with attempted second degree murder, attempted aggravated rape, and attempted aggravated crime against nature. Porter pled not guilty at arraignment. At a hearing on February 4, 1998, the trial court denied defendant’s motions to suppress the evidence, statements and identification and found no probable cause as to attempted aggravated rape. On June 29, 1999, the trial court denied defendant’s motion for continuance, and trial commenced. On June 30, 1999, the jury found defendant guilty as charged on all counts.
The state filed a multiple offender bill of information alleging defendant to be a fourth felony offender. Defendant was sentenced on July 12, 1999 to concurrent fifty year sentences on counts one and two, and to ten years on count three. All sentences were imposed without benefit of parole, probation or suspension of sentence. The trial court found defendant to be a fourth felony offender, and after vacating defendant’s sentence on count one, the court sentenced defendant to life in prison without benefit of parole. Defendant subsequently filed this appeal.

19FACTS

At trial, the victim, M.L., testified that early on the day of May 24, 1997, she was at an acquaintance’s house, where she smoked possibly three rocks of crack before returning home. Approximately three hours later, the victim returned to the house where several people had congregated and encountered Porter. After a brief conversation, defendant asked the victim if she would accompany him to his brother’s apartment in DeGaulle Man- or, a nearby apartment complex, to get twenty dollars. The victim admitted that she believed the defendant was going to get a rock or possibly that he was going to get the money with the intent of paying her for sex.
M.L. walked with the defendant to DeG-aulle Manor. They took the elevator to the fifth floor and exited. Defendant told the victim that they were going to go smoke, but M.L. told the Porter that she did not want to. She explained that she had never smoked outside and knew that the complex had a security guard. Porter began pulling her arm. M.L. testified that she was afraid but went with the defen *68 dant anyway. Porter began smoking from a pipe and offered some to the victim. She testified that she took the pipe but only pretended to smoke from it. She stated, “I was scared and nervous. He already he was making me nervous when he kind of jecked [sic] me and brought me to the back from the git-go. My mind wasn’t on smoking you know. I just kept saying, ‘When you going to get the twenty dollars. Let’s go by your brother.’ ”
At this point the defendant began to request sex from the victim. He stated to her, “Well yeah, what you going to do for me. I gave you my stuff.” M.L. refused to go along with defendant’s requests, but he continued with his demands for her to perform oral sex or to engage in intercourse. Porter then took a knife |3from his pocket and told the victim that she was going to do as he asked. The victim continued to refuse his demands. She then tried to convince him that someone was coming when she saw the elevator light come on, and he put the knife back in his pocket. Porter walked over to the elevator and saw that no one was there. He came back, pulled the knife out, and continued with his demands for sex. Again the victim told Porter that someone was coming. Thinking that this was her opportunity to escape, as Porter walked to the elevator, M.L. followed, but Porter told her to “Get back there” and to take her clothes off. Porter approached her with the knife in his hand, and the two struggled. The knife fell to the ground and Porter recovered it. The victim was on the ground scooting back as Porter made stabbing motions towards her. The victim said she was scared and crying.
Porter reiterated his demands for M.L. to take her clothes off. The victim testified that she thought the defendant was going to rape and kill her. Porter became increasingly agitated and threatened to throw the victim over the balcony if she continued to refuse him. The victim offered to go get twenty dollars from a friend or to give Porter her jewelry. Porter continued to demand that the victim remove her clothes and threatened her with the knife. The victim unbuttoned her clothing so that her brassiere was exposed, but she held onto her clothes telling Porter that she was not going to take them off. Porter stated “Pm not going to tell your f-ing ass no more. Hoe, take them f-ing clothes off.”
Once again, the victim told Porter that the elevator was coming. She testified that she realized this was her last chance and ran, losing her shoes, but Porter grabbed her by the shoulder and stated, “I told you, Pm tired of y’all hoes. I’m going to kill one of y’all hoes. Bitch, come here.” He then stabbed her in the |4neck with the knife and wiped it off. The victim watched as Porter walked down to the first floor. Once he reached the first floor he started running.
The victim knocked on all of the doors, but no one responded. She went down to the fourth floor, where a girl with a baby came out. The victim asked the girl to please help her, to call the police, and told her that a man had tried to rape and kill her. The girl gave her towels for the blood. The police arrived first, and after the ambulance arrived, she was put on a stretcher and taken to Charity hospital.
The victim also explained that in 1998, she admitted herself to Charity Hospital because she was hearing voices. She explained that she suffered from schizophrenia. The victim admitted that she had been taking marijuana and cocaine for ten or fifteen years, and that she had smoked a rock of crack cocaine three days before the trial.
Dr. Richard Riehoux was admitted by stipulation as an expert in forensic psychi *69 atry. Riehoux testified that he had reviewed the victim’s medical records from the incident in question as well as records from July 1998 pertaining to psychiatric treatment received by the victim in an effort to understand what kind of psychiatric problems she might have. Riehoux stated that he had spoken to the state and the defense about the case.
Dr. Riehoux testified that the July 1998 records clearly indicated that the Charity Hospital psychiatric personnel viewed the victim as suffering from schizophrenia and having a history of substance abuse. Dr. Riehoux stated he could not find any records of any observed mental status abnormalities. Dr. Riehoux related that in his experience, when an individual is being treated for a |smedical problem and that person shows obvious signs of mental illness, there is ordinarily some documentation of that fact.
On the morning of trial, Dr. Riehoux met with the victim for nearly an hour. He found that in some respects, she showed symptoms consistent with a diagnosis of schizophrenia. The victim was much more communicative and expressive than is typical for schizophrenics; however, the victim’s reports of experiencing auditory hallucinations were consistent with the disease. Riehoux testified that it is possible to misdiagnose someone as schizophrenic who is actually suffering from severe cocaine abuse, as many of symptoms of schizophrenia can be replicated by severe cocaine abuse.
Riehoux related that the records from the May 1998 admission reflect that the victim heard voices that told her to kill her husband and to cut herself and bleed. The victim also related that she experienced visual hallucinations, such as seeing people in trees, which would be an uncommon symptom for schizophrenia and more likely related to substance abuse. Riehoux acknowledged that a drug user might have a hallucination of a six headed monster and think it is a reality, but when not intoxicated and asked about the experience the user would know the six headed monster was a figment of the user’s imagination. He further stated that most people do not experience visual hallucinations while they are under the influence of cocaine, but when they do, the hallucination is of a bizarre quality like a monster, rather than a hallucination of an ordinary human being.
The best opinion the doctor could form was that the victim was suffering from a combination of symptoms. Finally, Dr. Ri-choux stated that he was in no position to tell whether the victim was telling the truth or was purposely lying, and | fithat he did not think what the victim told him about the incident was based on a distortion of reality by psychotic symptoms.
At trial, Officer Melissa Gregson testified that when she arrived on the scene, the victim who was crying hysterically and covered in blood. The victim’s wound was extremely deep. Gregson radioed to have EMS hurry up. Gregson attempted to speak to the victim, but she was hysterical and kept repeating, “He tried to kill me, he tried to rape me.”
After the victim was transported to the hospital, Officer Gregson spoke to the woman who had responded to the victim’s cries for help, and was able to determine that the attack had occurred on the fifth floor. Gregson went to the area and located the victim’s shoes and earrings.
Dr. G. Paul Dabrowski testified that on May 24, 1997, he was employed as leader of an emergency surgical team assigned to Charity Hospital. Dr. Dabrowski testified, pursuant to a stipulation, as an expert in the field of trauma surgery. After examining the victim, Dabrowski decided that *70 surgery was needed to determine whether any of the major blood vessels in the area, such as the carotid artery or jugular vein, had been affected, as injury to either each can result in massive blood loss and death. Dr. Dabrowski also related that an injury to either the esophagus or trachea, which are located near the wound, could prove fatal as well. Dr. Dabrowski determined that the wound did not injure the major blood vessels or organs of the victim’s neck. The wound was located approximately one inch from the jugular vein and the esophagus.
Dr. Dabrowski referred to the victim’s medical records for indications of her mental status at the time. He testified that she was noted to be alert and responsive to commands. Dr. Dabrowski believed that if she had been overtly psychotic this 17would have been documented as possibly combative, anxious or something other than cooperative. Dr. Dabrowski testified that routine drug screening reflected the presence of cocaine and marijuana.
Detective Donald Nides testified that on June 2, the victim contacted him and informed him that the perpetrator was possibly named “Mike” and lived at a certain address. The next day Nides and the victim proceeded to the location. Several men were outside the residence. The victim observed the defendant and exclaimed, “That’s him, that’s him.” Nides arrested the defendant and recovered a knife in his back pocket. The victim testified that the knife looked like the knife used to attack her.
Det. Nides testified that after he advised Porter of his rights, he stated that he had no knowledge of the incident, and that he was at home on the night in question. After the detective explained to Porter that a he had a witness who put him and the victim together on that night, Porter related that he had met the victim at a party, and had gone to DeGaulle Manor to get some money from his brother who lived there. Porter stated that once they arrived, several males attacked them, so he fled the scene.
Thereafter, Porter consented to give a typed statement, which Nides read to the jury. In the typed statement, Porter admitted that he was called “Mike” by some people. He further elaborated that he planned to have oral sex with the victim in exchange for buying her crack cocaine. In the statement, Porter related that while in the breezeway of the second building, two men with handkerchiefs across their faces attacked them. They took his wallet containing sixty dollars, and he broke free and ran. Porter did not report the incident to police nor did he return to check on the victim. Porter then went home.
1 RAngela Williams testified that on May 24, 1997, she lived on the third floor of the building in question. She was inside her apartment when she heard screaming for help, and when she went to investigate, she observed a woman coming down from the fourth floor. Williams took the woman into her apartment and put some towels around her neck, which was bleeding heavily from a stab wound. Williams testified that the woman stated that a man tried to rape her in the elevator corner. Williams recalled that the woman was not wearing shoes.

ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER 1

Defendant contends the trial court committed error when it denied defense counsel’s request for a continuance. To grant or refuse to grant a motion for continuance rests within the sound discretion of the trial court. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. A *71 ruling will not be disturbed on appeal absent a clear showing of abuse of discretion, and a showing of specific prejudice caused by that denial. State v. Benoit, 440 So.2d 129 (La.1983). When a motion to continue is based upon a claim of inadequate time to prepare a defense, the specific prejudice requirement has been disregarded only when the time has been “so minimal as to call into question the basic fairness of the proceeding.” State v. Jones, 395 So.2d 751 (La.1981). The reasonableness of discretion issue turns upon the circumstances of the particular case. State v. Simpson, 403 So.2d 1214 (La.1981).
UOn the morning of trial, defense counsel requested that the trial court continue the trial. Counsel related to the court that because he had not anticipated the case going to trial that day, he was unprepared.
Sometime before the trial date, the state had offered not to file a multiple bill against the defendant in exchange for a guilty plea. It appears the plea bargain also anticipated that Porter would receive a ten-year sentence on all three counts. The plea bargain was offered under the constraint that it must be accepted prior to trial, or before the state had incurred the expense of flying a witness in from out of town.
A status conference was scheduled for the morning before trial, apparently for the purpose of affecting the plea if it was to be accepted. Defense counsel was unable to attend the hearing, and telephoned the court to relay the fact that his client had agreed to accept the tendered plea agreement. However, the assistant district attorney had departed the courtroom prior to the defense counsel’s telephone call. Not having received word that Porter would accept the offer, the State flew its witness in for trial.
On the morning of trial, defense counsel was under the impression that he had successfully communicated the fact that his client would enter a plea under the terms of the offer and that there would be no trial. The state, however, having incurred the expense of flying its witness to New Orleans, related that the previous offer was no longer available and pronounced ready for trial.
At the hearing on counsel’s motion, counsel’s arguments were substantially directed at the efficacy and diligence of his efforts at relaying his client’s intent to accept the plea agreement. However, the trial court noted the fact that no plea was entered on the day before trial placed the state in a difficult situation, saying:
hoAgain for the record, as we say in this case is, but their [the prosecutors’] bind was that without having it done, they were faced with the possibility on the day of trial, of a defendant saying, no, and no witness available for then, and in a real bind. I made that bind perfectly clear to them. That was the situation they were faced with yesterday. That is, without the deal done, showing up this morning having not secured their witness’s presence and faced with the possibility of the defendant choosing not to go forward with the deal. And then, of course, they would then be, if you like, Mr. Derbigny, in a world of lawnmowers, they would be grass in a world of lawnmowers. That was their problem. It’s as simple as that. That was there problem.
From the court’s comments, it is clear that the court had apprised the parties that there would be no continuances granted on the day of trial. Furthermore, it is clear that in order to accept the plea bargain, a plea would have had to be entered prior to the day of trial. The failure of defense counsel to grasp this point does *72 not render the trial court’s denial of the motion to continue an abuse of discretion.
As to any specific prejudice, the record reflects that counsel had announced readiness for trial at the previous trial setting approximately one month before. Although counsel related to the court that he wás unprepared, counsel cited only his failure to conduct further discussions with Dr. Richoux, and he read a copy of a letter to the doctor dated June 22, 1999. In short, the letter relates that counsel would forego any further discussions with the doctor because there was a possibility that his client would enter a plea in the case. The letter also reflects that Dr. Richoux had reviewed the records and discussed them with counsel previously.
On appeal, defendant alleges that counsel’s belief that no trial would occur caused him to fail to call any witnesses to corroborate his client’s statement, or to introduce any other evidence to exculpate his client. However, the record does not reflect that counsel even insinuated that any defense witnesses were unavailable to testify.
[nFrom the record, there is nothing to indicate that defendant was prejudiced by the denial of the motion to continue the trial, or that the trial court abused its discretion in denying the motion. The assignment or error lacks merit.

ASSIGNMENT OF ERROR NUMBER 2

Defendant contends the evidence was insufficient to support his conviction. Defendant does not challenge the evidence with respect to any given element of the crimes, but rather he contends generally that the victim’s testimony was not worthy of belief. The standard of review for the sufficiency of the evidence is whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
Initially, Porter contends that the many internal contradictions within the victim’s testimony cast doubt on her credibility. Defendant’s first example of an internal contradiction by the victim relates to how many times she had seen the defendant on the day of the incident. The testimony in question was as follows, “I met him several times. I met him three times. No let me see. I met him twice, I think.” The victim then related three instances where she encountered the defendant.
Additionally, defendant suggests that the victim changed her testimony midstream concerning whether she was taking medication for her schizophrenia or not on the day in question. At one point, the victim’s testimony on cross-examination appeared somewhat confusing in that she related that she was on prescription medicine, but that she was not being treated for schizophrenia at that 11gtime. However, on direct examination, the victim related that she had stopped taking medicine for schizophrenia at the time of the incident, and reiterated that fact on cross-examination. The victim also resolved any apparent discrepancy when she related that she was taking prescription medicine for an accident.
Defendant’s final example of an internal contradiction by the victim relates to whether the she was wearing her glasses at the time of the attack. Defendant contends the victim changed her mind during her testimony. The victim’s testimony was as follows:[1]
*73 Q. Do you recall, ma’am, whether you were wearing glasses at the time you were attacked?
[[Image here]]
A. Let me see. I don’t remember. I ain’t going to story. I don’t remember. I know I had glasses. I don’t know whether I had them on or not, but I think I had them on. I am not sure. I really think so, but I can’t remember. My eyes wasn’t as bad back then as they are now, to me.
Defendant contends further that no reasonable juror could have believed the victim in light of the above referenced discrepancies in her testimony coupled with her history of drug abuse and mental illness. Defendant notes further that other than the victim’s testimony, there was no evidence or other testimony linking defendant to the crime.
With respect to the victim’s mental disorder, Dr. Richoux testified that he saw no evidence in the victim’s recollection of the events that she would have been incapable of knowing what was going on at the time, or incapable of identifying an attacker. Furthermore, Dr. Richoux’s review of the medical records from the attack did not reflect any observed mental status abnormalities by the victim.
hsAs to the lack of corroboration, many aspects of the victim’s account were corroborated by the defendant himself, the most important being his presence at DeG-aulle Manor on the night in question with the victim. Furthermore, the physical evidence recovered from the fifth floor as well as the testimony of Angela Williams corroborates many aspects of the victim’s testimony. Finally, when Porter was arrested, he was in possession of a knife, which looked like the knife used in the attack.
It should also be noted that the defendant’s account of the events on that night could be seen as suspect. Defendant’s claim that the two alleged perpetrators stole sixty dollars is strange in light of the fact that he stated that he went to De Gaulle Manor to borrow money from his brother. Also, the jury could have found defendant’s initial denial suspicious. Finally, the jury may have questioned the veracity of the defendant’s account in light of the fact that he did not report the alleged robbery.
It is well-settled that credibility decisions by the jury should not be disturbed unless such finding is clearly contrary to the evidence. State v. Harris, 624 So.2d 443 (La.App. 4 Cir.1993). A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992). The critical inquiry for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia. Here the record evidence supports a finding by this court that the jury did not abuse its discretion in finding the defendant guilty.

ASSIGNMENT OF ERROR NUMBER 3

Defendant contends he was prejudiced by the introduction of an enlargement of a Polaroid picture of the victim’s neck wound. In State v. Johnson, 94-0236, pp. 7-8 (La.App. 4 Cir. 3/16/95), 652 So.2d 1061, 1067, this court set forth the general rules applicable to photographic evidence as follows:
Photographs which illustrate any fact, shed light upon any fact or issue in the *74 case, or are relevant to describe the person, place, or thing depicted, are generally admissible. State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Hartman, 388 So.2d 688 (La.1980). The test of admissibility is whether the probative value of the photograph outweighs the possible prejudice which might result from its display to the jury. State v. Moore, 419 So.2d 963 (La. 1982); State v. Jones, 381 So.2d 416 (La.1980). Determining the proper use of photographs at trial is generally within the sound discretion of the trial judge, who can best decide whether they serve a proper place in the jury’s enlightenment and its ruling in this respect will not be disturbed in the absence of an abuse of discretion. State v. Kelly, 362 So.2d 1071 (La.1978).
La. C.E. art. 403 allows a court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Photographs of a victim’s wounds may be relevant to show a defendant’s intent to kill. State v. Landry, 388 So.2d 699, 704 (La.1980).
Defendant’s argument rests substantially on the argument that the photograph in question was enlarged for the specific purpose of inflaming the jury. However, the original photograph was a Polaroid, and consequently, relatively small. Therefore, there was a legitimate need to enlarge the photograph.
Furthermore, the photograph in question was taken approximately one month after the wound was inflicted. Accordingly, the photograph was not of overly |1Rgraphic or gruesome such as the autopsy photographs found objectionable in State v. Morris, 245 La. 175, 157 So.2d 728 (1963). Finally, the photograph was particularly relevant as the nature and exact location of the wound related directly to the elements of the crime. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 4

Defendant contends the trial court erred in adjudicating him a fourth felony offender. The Louisiana Supreme Court in State v. Shelton, 621 So.2d 769 (La.1993), reviewed the jurisprudence concerning the burden of proof in habitual offender proceedings and found it proper to assign a burden of proof to a defendant who contests the validity of his guilty plea. In State v. Winfrey, 97-427 (La.App. 5 Cir 10/28/97), 703 So.2d 63, 80, the Fifth Circuit Court of Appeal addressed the procedure for determining the burden of proof in a multiple offender hearing:
If the defendant denies the multiple offender allegations then the burden is on the State to prove (1) the existence of a prior guilty plea, and (2) that defendant was represented by counsel when the plea was taken. Once the State proves those two things, the burden then shifts to the defendant to produce affirmative evidence showing (1) an infringement of his rights, or (2) a procedural irregularity in the taking of the plea. Only if the defendant meets that burden of proof does the burden shift back to the State to prove the constitutionality of the guilty plea. In doing so, the State must produce either a “perfect” transcript of the Boykin colloquy between the defendant and the judge or any combination of (1) a guilty plea form, (2) a minute entry, or (3) an “imperfect” transcript. If anything less than a “perfect” transcript is presented, the trial court must weigh the evidence submitted by the defendant and the State to determine whether the State met its burden of proof that defendant’s prior guilty plea was informed and voluntary.
*75 Following Shelton, the Louisiana Legislature amended La. R.S. 15:529.1(D)(l)(b) to place the burden on the defendant to challenge a predicate 11fieonviction in a multiple bill proceeding. State v. Bass, 99-0388 (La.App. 4 Cir. 6/14/00), 767 So.2d 772. See also State v. Boles, 99-0427 (La. App. 4 Cir. 5/10/00), 763 So.2d 74. La. R.S. 15:529.1(D)(l)(b) presently (and in 1999) provides:
Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
Defendant, pro se, filed a motion to quash the multiple bill, in which he alleged that the state had failed to prove that he had been properly Boykinized in his 1971 and 1978 predicate offenses. Accordingly, defendant has preserved the issue for appeal. State v. Washington, 98-0583 (La. App. 4 Cir. 11/17/99), 747 So.2d 1191.
With regard to defendant’s 1971 conviction for aggravated rape, defendant attacks the validity of the notarized affidavit wherein defendant waived his rights. Defendant contends initially that because his initials do not appear beside any of the specific rights, the affidavit is defective. However, the waiver is in the form of an affidavit and does not anticipate having the defendant initial any part of the document. In State v. Robair, 622 So.2d 829 (La.App. 4th Cir.1993), this court found that where there were no blanks for initials on the plea form, the absence of the defendant’s initials by each right that was being waived did not invalidate the waiver.
117Pefendant contends further that the two page affidavit is defective because “it is not clear that page two of the affidavit that is signed is even part of the affidavit of page one, that is, there is no way to ensure that what the appellant was signing, or thought he was signing, was actually the contents that appear on page one.” The affidavit in question is not a generic affidavit or form as is commonly used and appears to have been created for this specific instance. The affidavit identifies George Michael Porter as the affiant and the charge to which he was pleading guilty on the first page of the affidavit. The fact that no signature appears on the first page of the affidavit, especially where such is not anticipated, is insufficient to invalidate the waiver. There is nothing to indicate that the two pages do not constitute a single document.
With respect to defendant’s 1978 conviction for aggravated crime against nature, defendant alleges the same basis for finding the plea form to be inadequate,, that the plea form is two pages and there are no initials by any of the requisite rights. However, there are no blanks for initials on the form. Additionally, there is nothing to indicate that two pages do not *76 constitute a single document. Defendant’s name and the offense appear on the first page, and his signature along with that of his attorney and the judge appear on the second page.
Defendant contends further that the multiple bill of information is defective in that it has an incorrect date for the 1978 conviction. The multiple bill lists the date of the conviction as October 24, 1978, rather than October 17, 1978, when the plea was entered. Defendant does not allege nor is there any indication that he was prejudiced by the discrepancy. The bill of information clearly identified the correct case number, parish and offense for which defendant was being billed. See State v. Jason, 99-2551 (La.App. 4 Cir. 12/6/00) 779 So.2d 865. The assignment of error lacks merit.

hJPRO SE SUPPLEMENTAL ASSIGNMENT OF ERROR NO. 1

Defendant contends the trial court committed error when it charged the jury relative to the elements of attempted second degree murder. The court instructed the jury by defining second degree murder and then providing the definition of an attempt. The court’s definition of second degree murder correctly stated that it is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. However, a specific intent to commit great bodily harm is not an element of the crime of attempted second degree murder. State v. Hongo, 96-2060 (La.12/02/97), 706 So.2d 419; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Butler, 322 So.2d 189 (La.1975).
As defendant notes, trial counsel failed to object to the jury charge. La. C.Cr.P. art. 801 provides that “[a] party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error.” Furthermore, La.C.Cr.P. art. 841 provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” In State v. LeBlanc, 97-1388 (La.App. 4 Cir. 9/23/98) 719 So.2d 592, this court held that the defendant’s failure to object to a similar jury instruction prevented appellate review.[2] This court’s review of the relative jurisprudence was as follows:
Despite the general rale, in State v. Williamson, 389 So.2d 1328 (La.1980), the Supreme Court reviewed an erroneous jury instruction even though the defendant failed to object at trial. The court stated:
[T]he asserted error involves the very definition of the crime of which the defendant was in fact convicted. Such an error is of such ] ^importance and significance as to violate fundamental requirements of due process.
389 So.2d at 1331.
But, in State v. Thomas, 427 So.2d 428 (La.1982), on rehearing, the Supreme Court cautioned:
Williamson should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection at occurrence.
427 So.2d at 435.
In Thomas, the trial court erroneously instructed the jury on the basis of a *77 superseded first degree murder statute. The Supreme Court rejected the notion that there exists in Louisiana criminal jurisprudence a so-called “plain error rule,” authorizing appellate review of the record for plain errors even in the absence of a contemporaneous objection. 427 So.2d at 432-33. In dicta, the court noted that, even if it had reviewed the claim of error, no relief was warranted because the defendant failed to demonstrate that he was substantially prejudiced by the irregularity.
Also, in another post-Williamson decision, State v. Belgard, 410 So.2d 720 (La.1982), the trial court gave an instruction to the jury from which it could have inferred that proof of specific intent to “create” great bodily harm was sufficient to convict the defendant of attempted second degree murder. The Supreme Court refused to review the defendant’s claim of error as to the giving of that jury instruction because he failed to object at trial. 410 So.2d at 720.
Nevertheless, in State v. Cavazos, supra, [610 So.2d 127 (La.1992) ] the Supreme Court cited Williamson for the proposition that:
A substantial probability that jurors may have convicted the defendant under an incorrect definition of the crime justifies setting aside a conviction on due process grounds even in the absence of a contemporaneous objection.
610 So.2d at 128.
In State v. Chisolm, supra, [95-2028 (La.App. 4 Cir. 3/12/97), 691 So.2d 251] as in the instant ease, the trial court erroneously charged the jury that to convict the defendant it had to find that the defendant had a specific intent to kill or inflict great bodily harm, but, also as in the instant case, the defendant failed to object. This court cited Thomas, supra, noting the general rule that the failure to object precludes appellate review, but, nevertheless, finding that “there is ample basis for | ^concluding that the erroneous jury charge on specific intent was harmless.... The guilty verdict of attempted second degree murder was surely unattributable to the erroneous charge .... ” 95-2028 at p. 7, 691 So.2d at 255.
Considering the above jurisprudence, we refuse to consider the claim of error on the ground that the defendant failed to object to the jury instruction.
97-1388, pp. 5-7, 719 So.2d at 595-596. (footnote omitted).
Furthermore, in State v. Hongo, supra, the defendant failed to object to an identical jury instruction as here, and our Supreme Court, citing State v. Thomas, made the statement that in order to preserve the error for direct review a defendant must make a contemporaneous objection;[3] however, the statement was dicta as the case was before the court on post-conviction. 96-2060, 706 So.2d at 422, n. 3.
Accordingly, this court will refrain from addressing the claim on the merits, because defendant alleges in his second pro se assignment of error that trial counsel was constitutionally ineffective for failing to object to the charge, which requires review of the error on that basis.

PRO SE SUPPLEMENTAL ASSIGNMENT OF ERROR NO. 2

Defendant contends he was denied the effective assistance counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 13 of the Louisiana Consti *78 tution when his trial counsel failed to object to the erroneous jury charge.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Reed, 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4 Cir. 1986).
A defendant’s claim of ineffective assistance of counsel is to be assessed by a two-part test: the defendant must show that counsel’s performance was deficient and that the deficiency prejudiced defendant. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). Counsel’s performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4th Cir.1992).
Defendant contends that the deficient performance prong of Strickland has clearly been met. This court should agree, as the Louisiana Supreme Court stated in State v. Hongo, “the rule of Butler has been well-established with over twenty years Induration and a reasonably competent attorney would know of it and properly object when presented with the instant erroneous jury charge.” 96-2060 at p. 6 (La.12/02/97), 706 So.2d at 422.
As to the prejudice prong of Strickland, in LeBlanc, this court found the error to be without merit under a harmless error analysis. However, defendant contends that the error is not amenable to harmless error review. Prior to this court’s decision in LeBlanc, the Third Circuit had concluded in State v. Pyke, 93-1506, (La.App. 3rd Cir.5/4/94), 640 So.2d 460, on the basis of Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) that an erroneous instruction such as at issue here was structural error, and therefore not susceptible to harmless error analysis. However, our Supreme Court has affirmed that a Butler error is a trial error, and therefore susceptible to harmless error review. The Court opined:
The Third Circuit misinterprets Sullivan. An improper definition of reasonable doubt permeates an entire verdict in that the jury has applied the wrong standard in judging the defendant on each and every element and a reviewing court has no way of discerning whether or not the jury would have found the same elements had they applied the proper standard.
Conversely, the erroneous instruction at issue merely added the improper additional element of “intent to inflict great bodily harm” along with the proper “intent to kill.” The jury is thus *79 presented with the proper standard and may not be presented with evidence which could support the improper element. In such a circumstance a reviewing court, following Sullivan, 508 U.S. at 279, 113 S.Ct. at 2081 can determine if the verdict is unattributable to the erroneous instruction. Therefore, this error is not of such magnitude as to vitiate all jury findings and may well have had no effect whatsoever.
Because the erroneous instruction at issue may be an irrelevancy and because a reviewing court can make this determination, the error is not structural such as that in Sullivan, but rather a trial error which may or may not have prejudiced defendant and thus is subject to harmless error analysis, or in the case of an ineffective assistance claim, an analysis of whether defendant was prejudiced by the error.
_[^96-2060 at pp. 5-6, 706 So.2d at 421-422 (footnote omitted).
In LeBlanc, this court’s analyzed harmless error as follows:
“Before a reviewing court may declare an error harmless beyond a reasonable doubt it must find that the verdict ‘actually rendered in this trial was surely unattributable to the error.’ ” (emphasis in original). State v. Vale, 96-2953, 97-0158, p. 2 (La.9/19/97), 699 So.2d 876, 877, citing State v.Code, 627 So.2d 1373, 1384-85 (La.1993) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).
The focus of the harmless error analysis is the defendant’s specific intent to kill. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desires the prescribed consequences to follow from his act or failure to act. La. R.S. 14:10(1); State v. Whins, 96-0699, pgs. 3-4 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, 1353, writ denied, 97-1227 (La.11/7/97), 703 So.2d 1263. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158, p. 11 (La.4/10/95), 653 So.2d 526, 532.
In LeBlanc, the defendant, who had murdered an individual earlier in the evening, fired four to six shots at three occupants of a police car, who were looking for him, and struck one of the officers. This court concluded that “when the defendant fired his gun from a distance of fifteen to twenty feet away, he intended the natural consequences of his actions, i.e. striking Det. Mims with a bullet or bullets and killing him.” This court concluded that the verdict was unattributable to the error and therefore harmless.
In State v. Brunet, 95-0340 (La.App. 1 Cir. 4/30/96), 674 So.2d 344, the defendant was convicted by a jury of attempted manslaughter after the judge gave an instruction which included the element of intent to commit great bodily harm. The facts presented to the jury were that the defendant and the victim, his apparent girlfriend, were having a prolonged argument during which the defendant was pacing in the bedroom with a six-inch kitchen knife. While the victim was leaning over to vomit inlMa bucket beside her bed the defendant stabbed her in the area of her kidney. The wound was so deep that the knife penetrated up into the chest area and may have punctured a lung. The treating physician testified that he believed the wound was life threatening. After stabbing the victim, the defendant left the residence saying he would return with help, but he failed to do so. Furthermore, before leaving, the defendant took the time to wash his hands and clean the knife. The First Circuit concluded that the guilty verdict was surely unattributable to the erroneous *80 jury instruction. The court had no doubt that the verdict was based on the defendant’s having a specific intent to kill.
In State v. Harris, 26,269 (La.App. 2 Cir. 9/21/94), 643 So.2d 779, the defendant was convicted of attempted second degree murder and his conviction was affirmed on direct review. Defendant filed an application for post-conviction relief which alleged that he was denied effective assistance of counsel because his attorney: “(1) allowed the trial court to erroneously charge the jury without objection; (2) allowed the prosecutor to inform the jury that they could convict him upon a finding of a specific intent to inflict great bodily harm; and (3) stated to the jury that the prosecution intended to establish his client’s culpability by showing that defendant had a specific intent to kill or to inflict great bodily harm.”[4]
At Harris’ trial the following facts were established. He and the victim were acquaintances. After indulging in the use of alcohol and marijuana the two were traveling in the defendant’s vehicle when he demanded that she give him a ring she was wearing. When the victim refused, the defendant struck her several times and then demanded that she have sex with him. The defendant then told the victim that | afjhe would drive her home; however, when the victim attempted to exit the car, Harris stabbed her several times. “He then dragged Ms. Jackson into the backseat of his automobile and drove away. When his vehicle ran out of gas, defendant told the victim to get into the trunk; however, Ms. Jackson was unable to move and defendant told her that he would ‘finish you off right here’ unless she got into the trunk as requested. Defendant left the victim locked in the trunk and set out to obtain gasoline. When she was finally rescued from the trunk, Ms. Jackson was in critical condition.” 26,269 at 9, 643 So.2d at 784.
On these facts, the court found that the evidence was overwhelming that the defendant possessed the requisite specific intent to kill the victim, and the court denied relief under the harmless error analysis and the two-part Strickland test.
In State v. Armant, 97-1256 (La.App. 5 Cir. 5/27/98), 719 So.2d 510, the defendant was convicted in a bench trial of attempted second degree murder. On appeal, defendant contended that the state failed to prove that he had the specific intent to kill, and that the trial judge misapplied the law because in his reasons for judgment he made repeated references to whether there was sufficient evidence to establish that the defendant had the intent to commit great bodily harm. The victim was stabbed several times with a barbeque fork about the head and face. Although the injuries were not life threatening, the victim was struck near a major artery. An injury to the victim’s eye also established that the defendant used great force. The victim had five visible scar wounds from the attack. The evidence established that “the defendant relentlessly pursued the victim through the neighborhood as she tried desperately to escape his violent assault”, 97-1256 at p. 16., 719 So.2d at 517 and “but for the intervention of neighbors the attack would probably have continued.” Id. The Fifth Circuit concluded that the trial judge’s verdict was unattributable to the | ^statements he made prior to convicting the defendant.
In the present case, Dr. Dabrow-ski testified that the victim’s stab wound *81 was a serious injury because of the proximity to major blood vessels, such as the carotid artery and the jugular vein, which transport blood to and from the brain. Angela Williams testified that when she came to the victim’s aid, she was bleeding heavily, and Officer Gregson testified that the victim was covered in blood and that the stab wound was so deep that it appeared she could look into the victim’s throat.
The defendant, while armed with a knife, repeatedly threatened the victim with the knife if she did not comply with his demands to have sex him. Defendant threatened to throw the victim over the fifth floor balcony if she did not do as he said. In the end, the victim refused to comply with the defendant’s commands and attempted to flee. When Porter caught her, he reiterated that he had warned her and then stabbed her in the neck, wiped the blood from the knife and walked away. One can only see the defendant’s act of stabbing the victim in the neck as the fulfillment of his threats. The verdict was surely unattributable to the error; no jury could have found that the Porter’s intent was merely to inflict great bodily harm. As such, defendant was not prejudiced by the error. The assignment of error lacks merit.

CONCLUSION

Accordingly, for the foregoing reasons, the defendant’s convictions and sentences are affirmed.

AFFIRMED.

. Defendant provides no record citation in support of this argument; however, the cited *73 testimony appears to be the portion of the victim’s testimony to which defendant refers.

. This court nevertheless determined that the error was harmless beyond a reasonable doubt.

. The court reasoned that because the error was not structural, it necessarily was not of such significance as to violate fundamental due process. Id.

. The application also contained a claim of error by the trial court in giving the erroneous jury charge.